**COPY–DATA SYSTEMS, INC., and Synergistics, Inc., Plaintiffs-Appellees,**

**v.**

**TOSHIBA AMERICA, INC.,
Defendant-Appellant.**

**No. 6, Docket 80–9048.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 14, 1981.

Decided Nov. 2, 1981.

As Amended Nov. 30, 1981.

---

John J. Witmeyer, III, New York City (Thomas R. Esposito, Michael L. Anania, Stuart C. Levene, Ford, Marrin, Esposito & Witmeyer, New York City, of counsel), for defendant-appellant.

Allan P. Hillman, Baltimore, Md. (Robert G. Levy, Berryl A. Speert, Frank, Bernstein, Conaway & Goldman, Baltimore, Md., of counsel), for plaintiffs-appellees.

Before OAKES and MESKILL, Circuit Judges, and BLUMENFELD, District Judge.*

MESKILL, Circuit Judge:

Toshiba America, Inc. ("TAI"), a New York corporation and a wholly-owned subsidiary of Toshiba Corporation, a Japanese corporation, appeals from a judgment of the United States District Court for the Southern District of New York, Owen, J., awarding $1,320,000 in treble antitrust damages to Copy-Data Systems, Inc., a New Jersey corporation.[1] Judge Owen found that TAI employed "varied tactics" to "eliminate competition between itself and Copy-Data" in various geographical markets for Toshiba brand copying equipment. The court concluded that TAI's actions constituted a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and resulted in the destruction of Copy-Data's business, valued by the court at $440,000. TAI challenges Judge Owen's findings of fact and determination of damages, but asserts that even if these findings are correct, they do not constitute a *per se* violation of the Sherman Act. Because we agree that the facts as found by the district court do not establish a *per se* violation, we reverse.[2]

## BACKGROUND

TAI markets office copying equipment, parts and supplies manufactured by TAI's Japanese parent, Toshiba Corporation, under the brand name "Toshiba." In 1970 Copy-Data, a company engaged in the wholesale distribution of office copying equipment and supplies, negotiated with TAI for an exclusive right to distribute Toshiba copying machines for the states of New York, New Jersey, Connecticut, Rhode Island and Massachusetts (the Northeast), and a non-exclusive right to distribute Toshiba copiers in Maine, New Hampshire and Vermont. At its own expense Copy-Data undertook to establish the name of Toshiba in the northeastern market for copiers. Copy-Data identified potential retail dealers and solicited them through public and private showings and demonstrations. Later, TAI made Copy-Data its exclusive distributor in Maryland, Virginia, Pennsylvania, Delaware, West Virginia and the District of Columbia (the Middle Atlantic), and Copy-Data began to develop dealers in these areas. Still later, Copy-Data's territory was extended to the Chicago area.

Shortly after Copy-Data began to develop the Chicago market, TAI informed Copy-

---

* Honorable M. Joseph Blumenfeld, United States District Judge for the District of Connecticut, sitting by designation.

1. Synergistics, Inc., a wholly-owned subsidiary of Copy-Data, was exclusively responsible for wholesale distribution of Toshiba copying equipment. For simplicity, we omit references to Synergistics, referring to the plaintiffs collectively as "Copy-Data."

2. The rendition of facts which follows is gleaned from the trial court's findings of fact and conclusions of law. Because we reverse the trial court's judgment on another ground, we express no opinion on TAI's challenges to these findings of fact.

Data that it intended to distribute directly in that area and asked Copy-Data to turn over its Chicago customer information. Not wishing to offend TAI, Copy-Data complied with this request.

In early 1973 TAI asked Copy-Data for a complete list of Copy-Data's dealer-customers. Copy-Data initially resisted this request, but complied after TAI promised to limit its use of the list to informing Copy-Data's dealer-customers of new Toshiba products, marketing techniques and price changes.

In November 1973, despite expressed satisfaction with Copy-Data's service, TAI's marketing manager informed Copy-Data that TAI was going to distribute directly in the Middle Atlantic and that Copy-Data should cease selling in that area. TAI told Copy-Data that a refusal to exit the Middle Atlantic would jeopardize Copy-Data's exclusive Northeast distributorship. Fearing loss of its right to distribute in the sizeable Northeast market and hoping to take advantage of the anticipated success of Toshiba's forthcoming plain paper copier, the BD–702, Copy-Data reluctantly gave TAI its Middle Atlantic customer records. Copy-Data suffered a loss of $20–$25,000 per month in revenues as a result of losing its right to distribute Toshiba copiers in the Middle Atlantic.

In April 1974 TAI informed Copy-Data of its plan to take over distribution of Toshiba copiers in the Northeast and in the Southeast, replacing Copy-Data and TAI's southeastern distributor, Atlantic Dictating & Business Equipment Company. In August 1974 TAI began to implement this plan and told Copy-Data that it was no longer authorized to hold itself out as the exclusive distributor of Toshiba copiers in the Northeast.

In September 1974 TAI persuaded Copy-Data to accept unneeded equipment on the representation that the purchase would not be charged to Copy-Data's credit line. This representation was either false when made or was dishonored shortly thereafter when TAI announced that Copy-Data's credit line had been reduced and that Copy-Data would be required to pay in advance by certified check for any new machines.

In October 1974 TAI told Copy-Data that its "primary area of responsibility" would be limited to New Jersey.[3] Later, TAI told Copy-Data that it would be required to pay down its entire credit line.

Despite the restrictions imposed on TAI, Copy-Data continued to distribute Toshiba equipment in the Northeast and in New Jersey. Unfortunately, serious technical problems with Toshiba's plain paper copier developed shortly after its introduction. Copy-Data was forced to accept returns of BD–702s from its customers and to credit the customers' accounts. Contrary to accepted industry practice and to TAI's own practice with other distributors, TAI refused to accept returns of faulty BD–702s from Copy-Data or to give Copy-Data credit for the defective machines. Because Copy-Data was paying in advance for these BD–702s but was unable to resell them, a serious cash flow problem developed which eventually drove Copy-Data into bankruptcy.

---

3. Shortly after this announcement Copy-Data received a letter from Toshiba cautioning Copy-Data not to undertake any great expense in training dealers. This letter was drafted originally by a TAI marketing manager but was changed by his superior in a manner that the district court found to evidence TAI's intent to restrict Copy-Data's sales to New Jersey. The relevant portions of the original and final drafts are set out below:

*Original:*
We would again like to caution you not to enter into any great deal of expense in training dealers on the BD–702. This is especially important in any area outside of the state of New Jersey.

*Final:*
We would again like to caution you not to enter into any expenses in training dealers on the BD–702 in the expectation of receiving any reimbursement from Toshiba for this training.

Because TAI had never reimbursed Copy-Data for expenses of dealer training, the district court found that the alteration of the letter was effected to remove the "antitrust implications" from the original draft.

Copy-Data's position in the district court was that TAI's tactics along with Copy-Data's coerced withdrawal from the Middle Atlantic constituted a horizontal market division which was *per se* illegal under Section 1 of the Sherman Act. *See, e. g., United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). Copy-Data elected to proceed on a *per se* violation theory alone, stipulating that if its classification of the conduct as horizontal failed, Copy-Data was "prepared to abandon ship," not wishing to proceed under the rule of reason. J.App. at 101 & 661.

After hearing argument from both parties, Judge Owen ruled that TAI had imposed a territorial restriction on Copy-Data which resulted in an allocation of geographical markets between Copy-Data and TAI. He labeled this allocation "horizontal" and illegal *per se*. Judge Owen reasoned that while *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), allows a manufacturer or supplier to impose territorial restrictions on independent distributors to further the manufacturer's marketing strategy, *Sylvania* does not protect a manufacturer that employs similar territorial allocations among independent distributors and its own direct distribution arm. In the latter situation, the district court stated, the manufacturer is not attempting to improve its ability to compete against other manufacturers, but is simply protecting itself from price competition at the distributor level in order to generate "selling profits."

## DISCUSSION

The traditional framework of analysis under section 1 of the Sherman Act is familar and does not require extended discussion. Section 1 prohibits "[e]very contract, combination . . ., or conspiracy, in restraint of trade or commerce." Since the early years of this century a judicial gloss on this statutory language has established the "rule of reason" as the prevailing standard of analysis. *Standard Oil Co. v. United States*, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619] (1911). Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. *Per se* rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (footnote omitted). To be considered "manifestly anticompetitive" and illegal *per se*, a restrictive agreement must have a "pernicious effect on competition and lack of any redeeming virtue . . . ." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). While restrictive agreements among independent business entities at the same level of the market, so-called "horizontal" agreements, are illegal *per se*, *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), restraints imposed by a manufacturer or supplier upon its distributor-or retailer-customers, so-called "vertical" restraints, can significantly benefit competition and are permissible unless they violate the rule of reason. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In the instant case we have a dual distributorship—a business structure in which one party, in this case TAI, operates a branch or dealership on the same market level as one or more of its customers. Since TAI was a supplier of Copy-Data, the parties were vertically related. Since both Copy-Data and TAI were engaged in the wholesale distribution of copiers, they were also horizontally related. A dual distributorship like the one in this case can generate agreements which at once appear horizontal and unredeemably damned under *Topco*, and vertical and conditionally approved under *Sylvania*. Thus the question is whether market restraints emanating from a dual distributorship are so plainly anticompetitive that we should declare them illegal "without elabo-

rate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Courts differ on whether restrictions imposed by a dual distributor are subject to *per se* or rule of reason analysis. While some courts have held that the rule of reason is the proper standard by which to judge such restrictions, *see Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. 1981); *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 638 F.2d 15 (4th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981); *Cowley v. Braden Industries*, 613 F.2d 751 (9th Cir.), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978); *Krehl v. Baskin-Robbins Ice Cream Co.*, [1979–2] TRADE CASES (CCH) ¶ 62,806 (C.D.Cal. 1979), other courts have held that the horizontal element of a dual distributorship renders restrictive agreements emanating therefrom illegal *per se, see Dougherty v. Continental Oil Co.*, 579 F.2d 954 (5th Cir. 1978), *vacated on other grounds*, 591 F.2d 1206 (5th Cir. 1979); *Pitchford v. Pepi, Inc.*, 531 F.2d 92 (3d Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir. 1975); *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir. 1973); *Crime Check and Communications Corp. of America v. Novar Electronics Corp.*, No. HM 75–1680 (D.Md. filed Sept. 19, 1978); *Interphoto Corp. v. Minolta Corp.*, 295 F.Supp. 711 (S.D.N.Y.), *aff'd on other grounds*, 417 F.2d 621 (2d Cir. 1969); *Guild Wineries & Distilleries v. J. Sosnick & Son*, 102 Cal.App.3d 627, 162 Cal.Rptr. 87 (Ct.App.1980).

A recent and thorough consideration of dual distributorships is found in *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d 422 (5th Cir. 1981). First Mississippi was a producer of fertilizers and chemicals which sold its products both directly to users and to independent dealers or brokers who resold to users. Abadir was a dealer which purchased fertilizer from First Mississippi for resale. Abadir alleged that First Mississippi forced it to agree to resell the fertilizer only for consumption in Asia—a territorial restriction similar to the one that the district court found to have been imposed in this case. Abadir claimed that this restriction was horizontal and therefore *per se* illegal. The trial court agreed.

On appeal, the Fifth Circuit reversed. Citing the Supreme Court's warning that when applying *per se* rules, "[l]iteralness is overly simplistic and often overbroad," *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*, 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979), the court refused to apply a *per se* rule to the dual distributorship merely because it contained horizontal elements. Cognizant of the Supreme Court's teaching that unlike agreements to divide markets by competitors at the same market level, supplier or manufacturer imposed market divisions can benefit competition, *see Sylvania*, 433 U.S. at 54–56, 97 S.Ct. at 2559–60, the court found potential competitive benefit in *Abadir* notwithstanding the horizontal aspects of the relationship. Noting the dearth of rule of reason cases analyzing the economic effects of dual distributorships and the Supreme Court's dictate that "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing," *Sylvania*, 433 U.S. at 58–59, 97 S.Ct. at 2561–62, the court held that the rule of reason was the proper standard by which to judge the conduct of First Mississippi.

We find the Fifth Circuit's analysis of this issue persuasive. The *Sylvania* decision was based on the recognition that territorial allocations imposed by suppliers or manufacturers, while they may limit intrabrand competition, can be of substantial benefit to interbrand competition.[4] New manufactur-

---

4. Interbrand competition is competition among sellers of various brands of the same generic product—in this case copiers. Intrabrand competition is competition among purveyors of the

ers, or manufacturers of new products, can use market restrictions to guarantee that distributors will have adequate resources of capital and labor to market an unknown product successfully and to provide service and repair facilities necessary to make that product acceptable to ultimate purchasers. *See Sylvania,* 433 U.S. at 55, 97 S.Ct. at 2560.

In this case, TAI was an insignificant force in the American market for copiers hoping to increase its market share primarily on the strength of a newly developed plain paper copier. To be successful in this quest, TAI not only had to develop a product the quality of which rivaled the offerings of industry giants Xerox and IBM, but also had to assure the availability of prompt and skillful after-sale service on this technically sophisticated machine. The ability of distributors to handle the difficult servicing and maintenance problems associated with plain paper copiers would be of utmost concern to all competent management personnel in companies in TAI's position. In these circumstances, TAI might well have had legitimate reasons, consistent with antitrust law and policy, to restrict Copy-Data's freedom to market Toshiba products.[5]

TAI was not in a position to exploit territorial restrictions by using them to benefit its direct distribution arm. TAI could not increase the prices of its copiers at the distributor level without destroying whatever ability it had to compete successfully in the interbrand market which was dominated by Xerox and which was being flooded by several new manufacturers at the time Toshiba was developing its plain paper copier. Facing such stiff interbrand competition, TAI could gain nothing at the distributor level by restricting competition in the intrabrand market. To the contrary, it would appear to have been in TAI's interest to market aggressively its machines and perhaps to lower prices at the distributor level to gain an increased share of the interbrand market.

Copy-Data suggests that TAI's coercive tactics somehow add strength to the argument that *per se* treatment of this case is justified.

> In fact, the violation here is of unusual severity because [TAI] did not simply divide markets; it appropriated for itself, for no consideration, an entire dealer (customer) network Copy-Data had established at great cost and effort over a substantial period of time. Then, it appointed *one* salesman to handle all of Copy-Data's accounts (in order to "compete against Xerox"). [TAI] did not simply divide markets; it took what was Copy-Data's, and it accomplished this by threatening the existence of plaintiff's business—and then destroying it.

Brief for Appellee at 53. While these allegations might aid Copy-Data in pursuing other avenues of legal recourse, they add nothing to the antitrust complaint. To hold that the antitrust laws are violated when a supplier unfairly treats a distributor without any showing that the supplier's actions had an anticompetitive effect would be to ignore the well established principle that "[t]he antitrust laws . . . were enacted for the 'protection of *competition,* not *competitors,*' *Brown Shoe Co. v. United States,* 370

---

product of a particular manufacturer. *See Sylvania,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.

**5.** We need not speculate as to the precise goals of TAI's restrictions on Copy-Data. Had Copy-Data pursued a rule of reason theory, an inquiry into the goals and the effects of the restrictions on both intrabrand and interbrand competition would have been appropriate. *See National Soc'y of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Eiberger v. Sony Corp. of America,* 622 F.2d 1068, 1076 (2d Cir.

1980). However, in determining that the *per se* rule does not apply, we need only recognize that the restrictions had sufficient potential to enhance competition, and hence should not be "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use[,]" *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 57–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977).

U.S., at 320," 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). *See Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 133–34 (2d Cir.) (en banc), *cert. denied,* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Copy-Data's allegations might be directed more properly to a claim of unfair competition or breach of contract.

In declining to apply the *per se* rule to this case, we recognize that territorial or customer restrictions in dual distribution systems affect only intrabrand competition. W. Liebeler, Antitrust Advisor § 2.20 (2d ed. Supp.1980). It cannot be gainsaid that *interbrand* competition, not *intrabrand* competition, is the "primary concern of antitrust law." *Sylvania,* 433 U.S. at 52 n.19, 97 S.Ct. at 2558 n.19. Moreover, "when interbrand competition exists, as it does among [sellers of copiers], it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Id.*

Expansion of the *per se* rule should be "approached with great caution." *Abadir,* 651 F.2d at 428. "It is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). With these principles in mind we hold that restrictions imposed by this dual distributor on its competitor-customers have sufficient potential for enhancing interbrand competition that they should be judged by the rule of reason notwithstanding the adverse impact that they may have on intrabrand competition. As the Fifth Circuit said in *Abadir,* 651 F.2d at 428:

> There is an insufficient history of rule of reason cases upon which to base an expansion of [the] *per se* rule to include all suppliers who also compete with their distributors .... If economic analysis indicates anything, it indicates that agreements of this type have potential legiti-

mate economic advantages, indicating that the rule of reason should be applicable rather than a *per se* rule.

The parties having stipulated that this case should proceed on a *per se* theory alone, *see* J.App. at 101 & 661, the judgment below is reversed and this matter is remanded to the district court with directions to dismiss Copy-Data's claim under Section 1 of the Sherman Act.