**BEYER FARMS, INC., Plaintiff,**

v.

**ELMHURST DAIRY, INC., Defendant.**

**No. CIV.A.00–CV–1353 (DGT).**

United States District Court,
E.D. New York.

April 11, 2001.

---

8. The state law claim for conversion against      defendant Tsui is not affected.

Paul A. Batista, P.C., New York, NY, Attorney for Plaintiff.

Mitchell C. Shapiro, Constantine & Partners, P.C., New York, NY, Attorney for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

Beyer Farms, Inc. ("Beyer Farms"), a wholesale dairy supplier, filed the present lawsuit against Elmhurst Dairy, Inc. ("Elmhurst"), a dairy processor and supplier, alleging that Elmhurst conspired with other dairy suppliers to restrain trade in violation of section one of the Sherman Act, 15 U.S.C.A. § 1 (West 1997). Elmhurst now moves to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Beyer Farms opposes this motion and moves for leave to file an amended complaint.

**Background**

**(1)**

Beyer Farms is a New York corporation that distributes milk and fluid milk products to restaurants and diners as well as various retail outlets—primarily consisting of small, independent grocery stores and convenience stores—for resale to the general public. Compl., ¶¶ 5–6. Beyer Farms does not produce or process its own milk products; it purchases them from milk processors, then sells them under the Beyer Farms brand name. Compl., ¶ 9.

Elmhurst is a milk processor, which means that it produces and processes milk and fluid milk products. Compl., ¶ 8. These products are sold to various dairies (the "non-defendant dairies"), which in turn sell the products under their own respective brand names. Compl., ¶ 8.[1] In addition, in November of 1998, Elmhurst began packaging and distributing its own milk products, selling them directly to retail outlets under the Elmhurst brand name. Compl., ¶ 7–8. Although it is now selling its own products, Elmhurst continues to act as a processor for other dairies which continue to sell those products under their respective brand names. Compl., ¶ 8. Both Elmhurst and Beyer Farms sell their products in the five boroughs of New York City. Compl., ¶ 6–7.

Beyer Farms alleges that Elmhurst has acted in concert with one or more of the non-defendant dairies for the purpose of restraining trade. Compl., ¶ 11. Initially, Beyer Farms claims that when Elmhurst began distributing its own products, it decided not to market to any retail outlet that was currently carrying the products of one or more of the non-defendant dairies. Compl., ¶ 12.

Consistent with this plan to protect certain non-defendant dairies, Beyer Farms also asserts that when an Elmhurst salesperson sold accounts to outlets that formerly were purchasing from the non-defendant dairies Queensboro and Bartlett, Elmhurst voluntarily surrendered the ac-

1. These non-defendant dairies include Tuscan Dairy Farms, Inc.; Bartlett Dairy, Inc. ("Bartlett"); Queensboro Farm Products, Inc.; Swede Farms, Inc.; Derle Dairy, Inc.; Empire City Dairy & Milk Products, Inc.; and Sweet Clover Farms, Inc. Compl., ¶ 8.

counts. Compl., ¶ 14. In contrast, Elmhurst freely sells or attempts to sell its products to retailers currently carrying Beyer Farms products. Compl., ¶ 15. Such action has led some of these outlets to breach ongoing contracts with Beyer Farms. Compl., ¶ 15.

Beyond this selective marketing, Elmhurst has taken other actions to damage Beyer Farms. For example, Beyer Farms claims that Elmhurst offers extremely low prices to certain retail outlets currently supplied by Beyer Farms with no intention of consummating a sale. Compl., ¶ 17. The purpose of this action, called "torching," is to induce these outlets to demand lower prices from Beyer Farms. *Id.* Similarly, Elmhurst has encouraged its sales force to specifically target customers of Beyer Farms. Compl., ¶ 18.

Even beyond these direct attacks on Beyer Farms, Elmhurst has colluded with at least one of the non-defendant dairies to divide up territory. Specifically, Elmhurst and Bartlett agreed to trade certain routes with each other, thus effectively distributing territories between themselves. Compl., ¶ 19.

All of these actions were taken for the purpose of putting economic pressure on Beyer Farms. By applying this pressure, Elmhurst hoped to either induce Beyer Farms to hire Elmhurst to process their milk products, or, failing that, to put Beyer Farms out of business. Compl., ¶¶ 21–22.

### (2)

Beyer Farms' first attempt to remedy these activities was by way of a suit filed on November 25, 1998, in Supreme Court, Kings County, alleging violations of New York's state antitrust law. In that suit, Beyer Farms sought a preliminary injunction, which was denied. This state action is apparently still pending.

Beyer Farms then filed an action in this court alleging that these actions violate § 1 of the Sherman act. *See* 15 U.S.C.A. § 1 (West 1997). As a result, it seeks treble damages as well as injunctive relief. Compl., ¶¶ 23–27.

### Discussion

### (1)

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ..." 15 U.S.C.A. § 1 (West 1997). Accordingly, in order to state a claim of conspiracy in restraint of trade, Beyer Farms must allege that: 1) Elmhurst entered into a contract or conspiracy, and 2) that the contract or conspiracy was in restraint of trade among the several states. *See International Dist. Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 793 (2d Cir.1987). Section 1 is directed only at joint action, and, accordingly, allegations limited to the decisions and actions of one entity acting unilaterally are not sufficient to state a cause of action under § 1, even if the intent of those actions is to restrain trade. *Id.* at 794; *see also Schwimmer v. Sony Corp. of Amer.,* 677 F.2d 946, 952–53 (2d Cir.1982). Put another way, the Sherman Act "does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).

### a. Conspiracy

The first challenge raised by Elmhurst is that the complaint fails to allege any conspiracy, combination, or contract, and, as such, fails to state a claim under § 1. In order properly to plead a conspiracy, the plaintiff must do more than

make a "bare bones" allegation that such a conspiracy exists. *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir.1972); *Mover's & Warehousemen's Ass'n v. Long Isl. Moving & Storage Ass'n, Inc.*, No. 98–CV–5373 (SJ), 1999 WL 1243054 (E.D.N.Y. Dec.16, 1999). The naked statement that the defendant "conspired" with other entities is not sufficient without some factual allegation as to what constituted the conspiracy. *See, e.g., Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade").

■ Beyer Farms claims to have met this burden by alleging that Elmhurst has conspired with the non-defendant dairies to "divide up" retail outlets among themselves. Pl. Mem., p. 9. The only factual allegations supporting this claim, however, deal exclusively with the conduct and decisions of Elmhurst alone. For example, the complaint alleges that Elmhurst executives decided, at a meeting attended only by Elmhurst personnel, not to solicit retail outlets that were already carrying milk products which Elmhurst processed for the non-defendant dairies. Compl., ¶ 12. Beyer Farms does not allege that this meeting occurred as the result of any kind of discussion, let alone an agreement, with any other entity. Nor does Beyer Farms allege that, after this meeting, Elmhurst shared this decision with any other entity or encouraged any other entity to act similarly. Nowhere in the complaint does Beyer Farms even claim that the non-defendant dairies reciprocate with Elmhurst by refusing to solicit retail outlets which carry Elmhurst brand products. To the contrary, the complaint only alleges that Elmhurst sales representatives abided by the policy of non-solicitation. Compl.,

¶¶ 14–15. As a result, these facts, even if true, do nothing to further Beyer Farms' bare allegation of a conspiracy.

Beyer Farms does, however, make one allegation which involves concerted effort with one of the non-defendant dairies. The complaint alleges that Elmhurst and Bartlett agreed to exchange two routes, such that Elmhurst would begin selling to all of the customers on the route that Bartlett once supplied, and vice-versa (the "Bartlett agreement"). This agreement suffices to establish a "conspiracy, combination ... or contract" under § 1. 15 U.S.C.A. § 1 (West 1997). The remainder of the acts of which plaintiffs complains, however, constitute unilateral actions by Elmhurst, and these acts cannot provide a basis for a § 1 claim.

**b. Scrutiny**

■■ The determination as to whether the remaining claim concerning the Bartlett agreement constitutes a violation of § 1 rests on the scrutiny to which it is subjected. If Bartlett and Elmhurst are seen as competitors on the same level of the market, this agreement would be viewed as a horizontal agreement to divide territory, something that would constitute a per se violation of § 1. If, on the other hand, Bartlett and Elmhurst do not act at the same level of the market, the agreement would be a vertical restraint and would be subject only to the rule of reason. *See Copy-Data Sys. Inc. v. Toshiba Amer., Inc.*, 663 F.2d 405, 408–09 (2d Cir.1981). In making the determination of what scrutiny the present agreement warrants, it must be remembered that agreements which are considered illegal per se are limited to a narrow class and "departure from the rule of reason should be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Continental T.V., Inc. v. GTE Sylvania,*

*Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–62, 53 L.Ed.2d 568 (1977).

At first blush, it would seem to be clear that Elmhurst and Bartlett, who were, after all, each selling their own brand of dairy products to the same retail outlets, would be operating at the same level of the market. This analysis, however, fails to consider the true relationship between the two companies, and the reasons for Elmhurst's behavior. Elmhurst processes the milk and milk products sold by Bartlett under the Bartlett name, as well as processing the milk and milk products sold under its own name. A manufacturer (or, in this case, a processor), which sells its own products at the same market level as other corporations selling the manufacturer's products under their own names is said to be acting as part of a "dual distributorship." *Id.* at 408.

■ The Second Circuit has held that an agreement made pursuant to a dual distributorship is not illegal per se. Rather, these agreements are subjected to the rule of reason. *See id.* at 409–11. This is true even where the products are sold by the two corporations under different brand names. *See Electronics Comm. Corp. v. Toshiba Amer. Consumer Prod., Inc.,* 129 F.3d 240, 244 (2d Cir.1997) (cellular phones manufactured by Toshiba, but sold under a different brand name by a different manufacturer); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131–32 (2d Cir.1978) (vacuum cleaners by one manufacturer, sold by that manufacturer and another company under different brand names).

In *Oreck,* for example, Whirlpool manufactured vacuum cleaners that were sold by Sears under Sears's "Kenmore" name. *Oreck,* 579 F.2d at 128. Whirlpool then began selling its own vacuum cleaners under the Whirlpool name, which were distributed by Oreck. *Id.* When the distribution agreement between Whirlpool and

Oreck expired, Whirlpool decided not to enter into a new contract with Oreck. Oreck alleged that this decision was prompted by Sears, which continued to purchase a substantial number of Whirlpool vacuums for resale under the Kenmore name, because Sears did not want competition from Oreck. *Id.* Accordingly, Oreck argued that Whirlpool and Sears had conspired and agreed not to compete with each other in the sale of the Whirlpool vacuum cleaners, and that this constituted a violation of § 1 of the Sherman Act. *Id.* At trial, the district court instructed the jury that if it found that such an agreement existed, that agreement was per se illegal, and the jury should consider damages. *Id.* at 129. The jury returned a verdict in favor of Oreck.

■ The Second Circuit reversed and remanded for a new trial. This decision rested in part on the recognition by the Second Circuit that the agreement alleged constituted an agreement between a manufacturer and one of its dealers, notwithstanding the fact that the manufacturer also sold its products on the same level of the market as the dealer. *Id.* at 131–32. Ultimately the court held that:

> something more than an agreement between Whirlpool and Sears to eliminate Oreck must be shown. The agreement becomes violative of § 1 of the Sherman Act only if it is *anticompetitive in purpose or effect*—in sum, it must be tested by the rule of reason.

*Id.* at 133 (emphasis in original). Thus, an agreement not to compete between a manufacturer and one of its distributers is judged by the rule of reason, regardless of whether both entities sell products at the same level of the market under different brand names. *See also Electronics Comm.,* 129 F.3d at 243–44 (dual distributorship agreements evaluated under rule of rea-

son); *Copy–Data Sys., Inc. v. Toshiba America, Inc.*, 663 F.2d 405, 408–09 (2d Cir.1981) (same).

The present case is analytically indistinguishable from *Oreck.* Elmhurst, like Whirlpool, "manufactures" its products and sells them under its own brand name in addition to selling the products to a distributor for resale under a different brand name. Thus, under *Oreck,* any agreement between Elmhurst and Bartlett must be judged under the rule of reason. This is true regardless of whether the agreement also damages an individual competitor. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (reversing Second Circuit and holding that an agreement between two individual, vertically-related entities is not per se illegal even where it is designed to disadvantage a horizontal competitor of one of the parties).

**c. Rule of Reason Analysis**

Elmhurst argues that Beyer Farms' complaint is deficient in two respects: first, the complaint fails to properly allege a relevant geographic market or product market, and second, it fails to allege an injury to competition in that market.

**1. Definition of the Market**

■ The "geographic market" is simply the geographic area where the competition occurs. *North Jersey Secretarial School v. McKiernan,* 713 F.Supp. 577, 583 (S.D.N.Y.1989). Beyer Farms alleges that this market consists of the five boroughs of New York City, and, for the purposes of this motion, this is specific enough.

■ The "product market," on the other hand, is the market for the particular business or industry involved. Beyer Farms describes the business as the "sale and distribution of milk and fluid milk products." Compl., ¶ 6. The complaint specifies the relevant product market by stating that the sale of these products is "primarily to retail outlets such as delicatessens, restaurants, diners, bodegas, small independent supermarkets, convenience stores, and coffee bars." Compl., ¶ 6.

Elmhurst, relying on several district court cases in this circuit, argues that this product market is not sufficiently defined. In particular, many district courts have dismissed antitrust complaints for failure to identify "substitute products" and failure to "distinguish among apparently comparable products or to allege other pertinent facts related to cross-elasticity of demand." *See, e.g., Re–Alco Ind., Inc. v. National Center for Health Educ., Inc.*, 812 F.Supp. 387, 391 (S.D.N.Y.1993); *McKiernan,* 713 F.Supp. at 583; *Schwartz v. Jamesway Corp.*, 660 F.Supp. 138, 141 (E.D.N.Y.1987); *Gianna Ent. v. Miss World (Jersey) Ltd.*, 551 F.Supp. 1348, 1353–54 (S.D.N.Y.1982). As explained by Judge Mukasey,

> [p]laintiff must explain why the market it alleges is in fact the relevant, economically significant product market. If a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to cross-elasticity of demand, as the complaint here fails to do, à court may grant a Rule 12(b)(6) motion.

*Re–Alco Ind.,* 812 F.Supp. at 391. Absent this level of detail, it is impossible for a court to determine what, if any, injury there is to competition. *Id.* at 392.

It cannot be disputed that Beyer Farms has failed to make sufficient allegations in this regard. The complaint does not explain what "fluid milk products" are; nor does it explain what the sources for such products are in the relevant market or if

there are other, substitute products available.

For example, Beyer Farms fails to include large supermarkets as a possible alternate source for the same products in the relevant products market. Both sides agreed at oral argument that such supermarkets do not rely on smaller dairies such as those in this case for their milk products. These markets would seem to be an alternative source for identical milk products, thus lessening the anti-competitive impact that the challenged agreement could have on the ultimate consumer. Any significant rise in milk prices in small, independent markets would simply lead to consumers turning to larger stores for their milk, thus ultimately hurting Elmhurst and the non-defendant dairies rather than benefitting them.

More importantly, Beyer Farms has failed to allege whether there are any other alternative sources for the small, independent retailers to obtain milk products. In other words, assuming that Elmhurst and Bartlett did divide territory in an effort to lessen competition between themselves, is there another source of identical milk products for these same small retailers? Indeed, it would seem that Beyer Farms itself is such an alternative source for this market and would only benefit from any attempt by Elmhurst to raise its prices. It is for this exact reason that intrabrand agreements, such as the agreement in the present case, are not per se illegal; they allow that brand to compete more effectively in the interbrand market. Consequently, Beyer Farms simply fails to properly define the product market or explain why certain products or sources of products are not part of that market. As such, the complaint provides no basis upon which the court can properly evaluate what impact the challenged agreement would have on competition.

## 2. Injury to the Market

Beyer Farms's complaint is similarly lacking in allegations concerning an injury to the market. The antitrust laws were enacted for the "protection of competition, not competitors." *Copy–Data,* 663 F.2d at 410 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)). Claims of unfair competition are properly addressed under state laws, not under federal antitrust laws. *Id.* Injury to an individual competitor, even if that competitor is effectively excluded from the market as the result of a contract, combination, or conspiracy, is not sufficient injury to state a claim under the Sherman Act. *See Eastway Const. Corp. v. New York,* 762 F.2d 243, 250 (2d Cir.1985).

Accordingly, an agreement will only be invalid if the plaintiff can demonstrate that the agreement will have an "actual adverse effect on competition in the relevant market." *Electronics Comm.,* 129 F.3d at 244. This injury must affect the market as a whole; merely showing an adverse affect on competition between or among different sellers of the same products, even if those products are sold under different brand names, is not sufficient to state a claim under § 1. *Id.* at 245 (affirming dismissal of complaint challenging dual distributorship where no affect on market was alleged). Moreover, where interbrand competition exists, that competition provides "a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." *Copy–Data,* 663 F.2d at 411 (quoting *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19).

Beyer Farms has failed to allege any actual or intended adverse impact on the market. Elmhurst has a genuine business

interest in not competing with Bartlett—preservation of that portion of its business devoted to selling milk products to other dairies for resale. Thus, any agreement between Elmhurst and one of its customers not to compete for certain routes would seem to be made not for the purpose of stifling competition, but rather for the purpose of increasing the ability of both to compete in the open market. As much as Elmhurst may want to sell its products directly to all available retail outlets under its own name, to do so at the risk of losing its large, dairy customers would be self-destructive. Thus, there is little indication that the objective of this agreement was to stifle competition. In fact, the only motivation for the contract which Beyer Farms specifically alleges was a desire to injure Beyer Farms individually, not to injure competition generally. *See* Compl. ¶¶ 21–22.

Moreover, Beyer Farms has not indicated how the effect of the contract would be damaging to competition. The only injuries that Beyer Farms alleges resulted from the "conspiracy" were injuries to Beyer Farms itself. Compl., ¶¶ 11–19. This allegation is plainly insufficient because it fails to provide any indication of how this results in harm to competition. Even if Beyer Farms were completely eliminated, there is no allegation that this would have a material adverse effect upon competition. As stated by the Second Circuit in *Eastway*,

> It is not enough that a plaintiff alleges that it is "in a worse position than [it] would have been had [defendants] not committed the [acts complained of]. . . ." Even if [plaintiff] was excluded from the relevant market, and even if its exclusion was the result of a "contract, combination or conspiracy" between [the defendants] such action could not possibly have injured competition.

*Eastway,* 762 F.2d at 250–51 (internal citations omitted). Granted, the defendants in *Eastway* did not stand to gain from the alleged conspiracy, whereas Elmhurst did stand to gain here, but that does not alter the fact that there is simply no allegation that competition was harmed by the Bartlett agreement, or any other alleged agreement in the complaint.

The elimination of competition between Bartlett and Elmhurst would only hurt competition if one or the other stood to gain a significant portion of the market, and thus become able to dictate prices to the public. There is no allegation to that effect here, and, more importantly, there is nothing preventing Beyer Farms from attempting to sell milk products to the same establishments. If Elmhurst or any of the non-defendant dairies attempted to profit from their alleged conspiracy by charging higher prices, this would only benefit Beyer Farms by making those retailers more willing to purchase Beyer Farms's milk products. Consequently, there are no allegations in, and no reasonable inferences that can be drawn from, the complaint that would indicate any harmful effects on competition, and the motion to dismiss is granted on this ground as well.

### (2)

### Amending the Complaint

Beyer Farms also moves to amend the complaint. While this would seem to be a reasonable request, unfortunately for Beyer Farms, it decided to include a proposed amended complaint. This amended complaint does little to repair any of the defects which doomed the original complaint. One additional defendant is added, the National Merchants Association, Inc. ("NMA"). Babbush Aff., Ex. 2 ("Amended Compl."), ¶ 5. The complaint has then been altered, apparently in an attempt to give it more of a conspiratorial air, by the addition of the phrase "joined by defendant

NMA" (or something similar) to many, but not all, of the allegations against Elmhurst.

The proposed amended complaint alleges that Elmhurst and NMA (who apparently is acting to help sell Elmhurst brand products, although the exact relationship involved is not explained in the complaint) are both refusing to compete with the non-defendant dairies, and are both targeting current customers of Beyer Farms.

The reason for these additions is clear enough—to create a more formal agreement and make the acts of Elmhurst less individual—but the failure to make other changes is telling. Either Beyer Farms did not recognize what the true deficiencies were in the original complaint, or it cannot, in good faith, cure them.

If NMA is merely a sales representative for Elmhurst, as Elmhurst claims, this would not cure the defect of a lack of conspiracy. *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1028–31 (2d Cir.1979) (corporation cannot conspire, as defined in § 1, with its own sales agents); *see also Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1316 (8th Cir.1986).

In any case, even assuming the conspiracy defect was cured by this amendment, Beyer Farms has failed to repair the other, equally obvious flaws in the original complaint. Because Beyer Farms does not appear to be able to define properly the product market and is not able to allege injury to competition generally, the request for leave to amend the complaint is denied as futile.

### Conclusion

For the above reasons, Elmhurst's motion to dismiss is granted; Beyer Farms' motion for leave to amend the complaint is denied. The Clerk of the Court is directed to close the case.