MEMORANDUM & ORDER
 

 DEARIE, District Judge.
 

 This case focuses on allegedly anticom-petitive conduct of a supplier and two distributors of home videos and digital video devices (“DVDs”) in the United States. Plaintiffs Flash Electronics, Inc. (“Flash”) and East Texas Distributing, Inc. (“ETD”), both wholesale distributors of videos and DVDs, claim that defendants Ingram Entertainment, L.L.C., Ingram Entertainment, Inc. (individually and collectively, “Ingram”), V.P.D. IV, Inc. and V.P.D., Inc. (individually and collectively, “VPD”), also wholesale distributors of videos and DVDs, have conspired with defendants Universal Music & Video Corp. and Universal Studios Home Video, Inc. (collectively and individually, “Universal”), suppliers of videos and DVDs, to deny plaintiffs the right to distribute Universal videos and DVDs in violation of the antitrust laws. Plaintiffs claim that defendants’ actions violated both Sections 1 and 2 of the Sherman Antitrust Act (“Sherman Act”), 15 U.S.C. §§ 1-2, and the Robinson-Patman Act, 15 U.S.C. § 13. Plaintiffs also assert state law causes of action for breach of contract, tortious interference with a contractual relationship, and fraud. Defendants bring this motion to dismiss all of plaintiffs’ claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, defendants’ motion is granted in part and denied in part.
 

 BACKGROUND
 

 Plaintiffs are two of the six major wholesale distributors of home videos and DVDs in the United States. Competitors Ingram and VPD are also among the six major national video distributors still in business. Universal, along with Sony, Paramount, Twentieth Century Fox, Time Warner and Disney, are the six major movie production studios in the country. Each of them produces and markets home videos and DVDs of motion pictures and television shows. To distribute their product, these studios supply videos and DVDs to wholesale distributors, such as plaintiffs, who, in turn, sell or license them to retail outlets in the “sell-through”
 
 [1]
 
 and rental home video and DVD markets. Universal also sells its product directly to certain larger retail chains.
 

 Plaintiffs assert that in the years prior to 2000, defendants Ingram and VPD began to pressure Universal to make them the exclusive distributors of Universal videos and DVDs in the United States. Plaintiffs contend that in September 2000 Ingram, VPD and Universal began negotiations to effectuate this plan. According to plaintiffs, the defendants met several times, in person and by telephone, and discussed plans concerning this venture. Plaintiffs specifically mention one meeting that allegedly took place at the Broadmoor Hotel in Colorado Springs, Colorado from
 
 *CDXXV
 
 September 18, 2000 to September 20, 2000. Am. Compl. ¶ 65.
 

 Plaintiffs maintain that defendants eventually reached an agreement that gave Ingram and VPD exclusive rights to distribute Universal Videos in the rental market. According to the complaint, Universal also entered into an agreement with Valley Media, Inc. (‘Valley”), another wholesale distributor, giving it the right to distribute Universal videos and DVDs in the “sell-through” market.
 
 [2]
 
 Plaintiffs contend that the agreements required the distributors “to give certain exclusive and favorable terms to Universal over all other film studios,” resulting in more active promotion of Universal products than those of other studios — an arrangement that plaintiffs analogize to “favored nations” treatment.
 
 Id.
 
 ¶ 72. Furthermore, according to plaintiffs, Universal’s agreements with Ingram and VPD prohibited the two distributors from selling Universal products to plaintiffs.
 
 Id.
 
 ¶ 76(d).
 

 Once the agreements were completed, defendants allegedly began taking steps to implement their plan. Prior to terminating its agreements with Flash and ETD, Universal asked plaintiffs for confidential customer information supposedly to “better evaluate its business in order to best support the plaintiffs with future promotions.”
 
 Id.
 
 ¶ 66. Plaintiffs maintain, however, that Universal then passed this information along to Ingram and VPD, who contacted these retailers and told them that Flash and ETD were now “unauthorized” to sell Universal videos and DVDs — a statement that Flash and ETD maintain was, at the time, a misrepresentation because their agreements with Universal had not yet been terminated.
 
 Id.
 
 ¶¶ 73-74, 76(c), 76(f)-(g). Plaintiffs also claim that defendants exerted further pressure on retailers by “bribing” them not to do business with plaintiffs in exchange for free Universal videos and DVDs, and by “coercing” them to agree to buy Universal product from defendants alone, and to agree not to sell Universal product to plaintiffs.
 
 Id.
 
 ¶ 76(a)-(b), 76(e). Furthermore, plaintiffs claim that defendants threatened to interfere with their supply of films produced by “Dreamworks SKG,” another movie studio, if plaintiffs continued to sell Universal products.
 
 Id.
 
 ¶ 76(i)-(j).
 

 In October 2000, Universal terminated its agreements with Flash and ETD. That same month, Ingram purchased a controlling interest in Major Video Concepts, which was, at the time, the second largest of the then eight national wholesale distributors. Plaintiffs allege that this transaction gave Ingram control over roughly 50% of the “video rental market channeled through distributors.”
 
 Id.
 
 ¶ 27. Plaintiffs also assert that VPD controls roughly 25% of the same market, giving the two companies a combined market share of 75%.
 
 Id.
 
 ¶¶ 28-29.
 

 Plaintiffs contend that these agreements have had a profound effect on the wholesale distribution market for home videos and DVDs. According to plaintiffs, retailers prefer to buy videos and DVDs from wholesalers that can provide them with all of the product they require. Hence, those distributors who no longer can supply Universal videos and DVDs are at a distinct disadvantage.
 
 Id.
 
 ¶¶ 39-40. Plaintiffs assert that the effects are already being felt. According to plaintiffs, Valley has been eliminated from the wholesale video and DVD distribution market entirely,
 
 see id.
 
 
 *CDXXVI
 
 ¶ 32,
 
 [3]
 
 and Baker
 
 &
 
 Taylor, another wholesale distributor, has recently terminated several employees.
 
 Id.
 
 ¶ 80. Moreover, plaintiffs assert that Ingram and VPD now possess a market share that allows them to inflate prices. By way of example, plaintiffs note that Universal submitted a June 2001 price quote to a Staten Island retailer for the film “Family Man” that was $10 above cost, whereas previously a comparable movie would have been quoted at roughly $1 above cost.
 
 Id.
 
 ¶ 86.
 

 Plaintiffs assert that the agreements between Universal, Ingram and VPD were calculated to eliminate competition in the video rental market and increase prices in violation of the antitrust laws. They claim that the defendants’ agreements constitute a “group boycott” that is a
 
 per se
 
 violation of Section 1 of the Sherman Act. Additionally, plaintiffs contend that defendants have engaged in illegal “price-fixing,” also a
 
 per se
 
 violation of Section 1 of the Sherman Act. Plaintiffs also claim that the agreements constitute a violation of Section 1 under the “rule of reason.” Furthermore, plaintiffs assert that the agreements threaten to create a monopoly in the video and DVD distribution market in violation of Section 2 of the Sherman Act. Plaintiffs also contend that defendants engaged in impermissible price discrimina,tion under the Robinson-Patman Act. Finally, plaintiffs maintain that defendants’ actions surrounding the termination of plaintiffs’ written agreements with Universal support claims for breach of contract, tortious interference with a contractual relationship and fraud.
 

 DISCUSSION
 

 A court considering a Rule 12(b)(6) motion must “assess the legal feasibility of the complaint.”
 
 Global Disc. Travel Servs., LLC. v. Trans World Airlines, Inc.,
 
 960 F.Supp. 701, 704 (S.D.N.Y.1997). The court must determine “not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims.”
 
 Scheuer v. Rhodes,
 
 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In assessing the adequacy of the complaint, the court must take all of the allegations contained therein as true,
 
 Hishon v. King & Spalding,
 
 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and draw all reasonable inferences in favor of the plaintiff.
 
 Todd v. Exxon Corp.,
 
 275 F.3d 191, 197 (2d Cir.2001);
 
 Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,
 
 128 F.3d 59, 63 (2d Cir.1997). A court may dismiss a complaint under Rule 12(b)(6) only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Todd,
 
 275 F.3d at 197-98 (quoting
 
 Conley v. Gibson,
 
 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).
 

 In the context of antitrust cases, the Second Circuit has stated that the “generous approach to pleading outlined in
 
 Conley v. Gibson”
 
 continues to apply.
 
 Furlong v. Long Island Coll. Hosp.,
 
 710 F.2d 922, 927 (2d Cir.1983);
 
 Hamilton Coll.,
 
 128 F.3d at 63;
 
 see also Todd,
 
 275 F.3d at 198 (quoting
 
 George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,
 
 554 F.2d 551, 554 (2d Cir.1977) (“[A] short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules.”)). Indeed, especially in antitrust cases, where the inquiries a court must conduct are often extremely fact-intensive, “dismissals
 
 *CDXXVII
 
 prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.”
 
 Todd,
 
 275 F.3d at 198 (quoting
 
 George Haug Co. v. Rolls Royce Motor Cars Inc.,
 
 148 F.3d 136, 139 (2d Cir.1998)). Despite this deferential standard, “conclu-sory allegations which merely recite the litany of antitrust ... will [not] suffice.”
 
 Global Disc.,
 
 960 F.Supp. at 704 (quoting
 
 John’s Insulation, Inc. v. Siska Constr. Co.,
 
 774 F.Supp. 156, 163 (S.D.N.Y.1991));
 
 see also Furlong,
 
 710 F.2d at 927 (conelu-sory allegations cannot “substitute for minimally sufficient factual allegations”). Moreover, it is inappropriate for the court to assume that the plaintiff can “prove facts that it has not alleged or that the defendants have violated antitrust laws in ways that have not been alleged.”
 
 Electronics Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,
 
 129 F.3d 240, 243 (2d Cir.1997) (quoting
 
 Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,
 
 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).
 

 A. Section 1 of the Sherman Act
 

 Section 1 of the Sherman Act prohibits “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States.” 15 U.S.C. § 1. Despite its broad language, the Sherman Act prohibits only contracts or agreements that
 
 “unreasonably
 
 restrain trade.”
 
 NYNEX Corp. v. Discon, Inc.,
 
 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (emphasis in original). Courts analyze the legality of such agreements using one of two frameworks: either the
 
 per se
 
 approach, or the “rule of reason.”
 
 See Virgin Atl. Airways Ltd. v. British Airways PLC,
 
 257 F.3d 256, 263 (2d Cir.2001);
 
 CDC Techs., Inc. v. IDEXX Labs., Inc.,
 
 186 F.3d 74, 79 (2d Cir.1999);
 
 Capital Imaging Assocs. v. Mohawk Valley Med.
 
 Assocs.,
 
 Inc.,
 
 996 F.2d 537 (2d Cir.1993). In general, there is a presumption against applying the
 
 per se
 
 rule.
 
 Business Electronics Corp. v. Sharp Electronics Corp.,
 
 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988);
 
 Bogan v. Hodgkins,
 
 166 F.3d 509, 514 (2d Cir.1999). Courts should only apply the
 
 per se
 
 rule in limited circumstances when the agreement at issue is of the sort that has proven so “manifestly anticompetitive” in the past that “because of [its] pernicious effect on competition and lack of any redeeming virtue [is] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use.”
 
 Continental T.V., Inc. v. GTE Sylvania Inc.,
 
 433 U.S. 36, 50, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (quoting
 
 Northern Pac. Ry. Co. v. United States,
 
 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958));
 
 accord Bogan,
 
 166 F.3d at 514. Examples of
 
 per se
 
 unlawful conduct include horizontal and vertical price-fixing, and certain types of group boycotts.
 
 See Capital Imaging,
 
 996 F.2d at 542-43. Absent these special circumstances, courts should conduct a rule of reason analysis and consider “all of the circumstances of [the] case,” such as the nature of the market and market participants involved, in determining whether the agreement at issue has an actual adverse effect on competition.
 
 GTE Sylvania,
 
 433 U.S. at 49 97 S.Ct. 2549.
 

 1. Per Se Violations (“Group Boycott’’ and “Price Fixing”)
 

 Plaintiffs first argue that the agreements between Universal, Ingram and VPD are a
 
 per se
 
 unlawful horizontal “group boycott” designed to exclude competitors, such as plaintiffs, from the video and DVD wholesale market. Defendants, on the other hand, maintain that the decision to terminate plaintiffs as distributors of Universal product represented
 
 *CDXXVIII
 
 nothing more than a completely legal, and rather unremarkable, effort on the part of Universal to restructure its distribution system to grant exclusive distributorships in the wholesale market to Ingram and VPD. Defendants contend that the agreements are therefore more properly characterized as vertical agreements, which are not analyzed under the
 
 per se
 
 rule absent evidence of price-fixing. Furthermore, defendants argue that their exclusive distributorship agreements with Ingram and VPD have a procompetitive effect on the market by allowing Universal to benefit from a more dedicated sales force which vigorously promotes its product, and in the process, spurs inter-brand competition. Accordingly, defendants maintain that these arrangements cannot be subject to
 
 per se
 
 condemnation.
 

 As a general matter, “[rjestraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.”
 
 Sharp Electronics,
 
 485 U.S. at 730, 108 S.Ct. 1515;
 
 Electronics Communications,
 
 129 F.3d at 243. An exclusive distribution arrangement, as it involves a vertical non-price restriction between a manufacturer and a distributor, is therefore typically analyzed under the rule of reason unless there is some evidence of price-fixing.
 
 Id.; Westman Comm’n Co. v. Hobart Int’l, Inc.,
 
 796 F.2d 1216, 1224-25 (10th Cir.1986);
 
 see also Sharp Electronics,
 
 485 U.S. at 735-36, 108 S.Ct. 1515 (“[A] vertical restraint is not illegal
 
 per se
 
 unless it includes some agreement on price.”). This rule holds true even for “dual distribution” systems, like the one set up between Universal, Ingram and VPD, where the manufacturer supplies its product to wholesale distributors and also sells its product directly to retailers, thereby operating on two different market levels simultaneously.
 
 Electronics Communications,
 
 129 F.3d at 243;
 
 Copy-Data Sys., Inc. v. Toshiba Am., Inc.,
 
 663 F.2d 405, 408-09 (2d Cir.1981);
 
 Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,
 
 142 F.Supp.2d 296, 302 (E.D.N.Y.2001).
 

 Courts have refused to place exclusive distributorship agreements within the category of
 
 per se
 
 restraints not simply because they are vertical in nature, but because vertical restrictions on intrabrand competition often have the procompetitive effect of increasing interbrand competition in the relevant market. As the Supreme Court recognized in
 
 GTE Sylvania,
 
 “[vjertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products.”
 
 GTE Sylvania,
 
 433 U.S. at 54, 97 S.Ct. 2549. Moreover, the severity of the intrabrand competitive restrictions are kept in check by the manufacturers themselves, because “manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products.”
 
 Id.
 
 at 56 97 S.Ct. 2549;
 
 see also Westman,
 
 796 F.2d at 1226 (“The only real incentive a manufacturer has to restrict distribution of its product is to make its product more competitive.”). Accordingly, manufacturers should be given “wide latitude in determining the profile of its distributorships.”
 
 Id.
 
 at 1225. Indeed, the Second Circuit has stated that absent a showing of price-fixing or an anticompetitive effect on the market as a whole, run-of-the-mill exclusive distributorship agreements are “presumptively legal.”
 
 IDEXX Labs.,
 
 186 F.3d at 80;
 
 Electronics Communications,
 
 129 F.3d at 245. This presumption falls squarely in line with the general principle articulated by the Supreme Court at a very early stage in the development of antitrust law that a manufacturer is free “to exercise
 
 *CDXXIX
 
 his own independent discretion as to parties with whom he will deal.”
 
 United States v. Colgate & Co.,
 
 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919).
 

 Plaintiffs attempt to circumvent these principles by characterizing the agreements between the defendants as a horizontal group boycott. Essentially, plaintiffs argue that Ingram and VPD, who are horizontal competitors, conspired to eliminate their rivals and either pressured or enlisted the support of Universal to achieve this goal, all in an attempt to gain market share and increase prices.
 
 See
 
 Am. Compl. ¶¶ 55-58. Plaintiffs also allege that the three defendants had several conversations by telephone and met in mid-September 2000 in order to advance their conspiracy.
 
 See id.
 
 ¶¶ 64-65. Finally, plaintiffs make several allegations that defendants improperly interfered with plaintiffs’ business relationships with their retail customers by spreading false information about plaintiffs’ authority to carry Universal product before they were, in fact, terminated by Universal as distributors.
 
 See id.
 
 ¶¶ 73-74, 76(f)-(g). Plaintiffs cite several cases in support of their position in which courts applied the
 
 per se
 
 rule despite the fact that the conspiracy in question was not exclusively horizontal.
 
 See, e.g., Rossi v. Standard Roofing, Inc.,
 
 156 F.3d 452 (3d Cir.1998);
 
 Big Apple BMW, Inc. v. BMW of North Am., Inc.,
 
 974 F.2d 1358 (3d Cir.1992);
 
 United States v. General Motors Corp.,
 
 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966);
 
 Klor’s, Inc. v. Broadway-Hale Stores, Inc.,
 
 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).
 

 Yet even assuming that the events transpired as plaintiffs contend, an assumption the Court must make at this stage, the allegations in the complaint cannot sustain a group boycott claim meriting the application of the
 
 per se
 
 rule. The Supreme Court has warned against expanding “the category of restraints classed as group boycotts,” observing that courts should exercise great caution in extending
 
 per se
 
 analysis “to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.”
 
 FTC v. Indiana Fed’n of Dentists,
 
 476 U.S. 447, 458-59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986). The Second Circuit has echoed that caution, while noting that “[t]he scope of the
 
 per se
 
 rule against group boycotts is a recognized source of confusion in antitrust law.”
 
 Bogan,
 
 166 F.3d at 515. The Supreme Court has more recently stated that “precedent limits the
 
 per se
 
 rule in the boycott context to cases involving horizontal agreements among direct competitors.”
 
 NYNEX,
 
 525 U.S. at 135, 119 S.Ct. 493. Defendants argue, and at least one court in this Circuit has agreed, that only when there is evidence that an agreement is “attributable solely” to horizontal competitors, having been conceived without the input of a party higher up in the distribution chain, will the
 
 per se
 
 rule apply.
 
 PepsiCo, Inc. v. Coca-Cola Co.,
 
 114 F.Supp.2d 243, 259 (S.D.N.Y.2000).
 

 Here, plaintiffs’ allegations do not fit this entirely horizontal scenario. Rather, the allegations in the complaint seem to suggest that the alleged conspiracy was hatched by all three defendants. Indeed, plaintiffs suggest that Universal harbored improper motives even before Ingram and VPD approached it. The amended complaint alleges that Universal desired “to control distribution of videos and DVDs in the market place, gain an unfair advantage over Universal’s competitors [and] fix prices.” Am. Compl. ¶ 54. Furthermore, plaintiffs allege that Universal entered into the agreements with Ingram and VPD “[to] reduce or eliminate competition at the distribution level” so that it could “raise prices of Universal [p]roduct above the
 
 *CDXXX
 
 then current market level.”
 
 Id.
 
 ¶ 55. These allegations seem to suggest that the agreement was not “attributable solely” to horizontal competitors.
 
 See PepsiCo,
 
 114 F.Supp.2d at 259. However, it is at least possible to interpret the complaint as alleging a conspiracy first devised by Ingram and VPD, and then expanded to include Universal as a party necessary to effectuate the plan. As the Court must grant plaintiffs every favorable inference at the motion to dismiss stage,
 
 Todd,
 
 275 F.3d at 197, it would be inappropriate to dismiss the claim on this ground.
 
 [4]
 

 Nevertheless, plaintiffs’
 
 per se
 
 group boycott claim fails for a different reason — there exists a compelling procom-petitive reason for the agreements between Universal, Ingram and VPD. In
 
 Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.,
 
 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Supreme Court laid out some basic principles governing the application of the
 
 per se
 
 approach to boycott cases. Among the factors to consider, the Court noted that the
 
 per se
 
 approach generally applies if the boycott “[was] not justified by plausible arguments that [it was] intended to enhance overall efficiency and make markets more competitive.”
 
 Id.
 
 at 294, 105 S.Ct. 2613. The Court further counseled that “[a] plaintiff seeking application of the
 
 per se
 
 rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompeti-tive effects.”
 
 Id.
 
 at 298, 105 S.Ct. 2613. The Supreme Court in
 
 NYNEX
 
 endorsed this same approach, approving of the Second Circuit’s decision to allow the defendants to justify the boycott before it would apply the
 
 per se
 
 rule.
 
 See NYNEX,
 
 525 U.S. at 135, 119 S.Ct. 493.
 

 In this case, plaintiffs themselves admit that there is a procompetitive justification for the agreements among Universal, Ingram and VPD. The amended complaint states, “Universal’s agreements with Ingram, VPD (and Valley (in the sell-through market only)) require distributors to give certain exclusive and favorable terms to Universal over all other film studios including a dedicated sales force for Universal [p]roduct and requires [sic] these distributors to pay for promotions, advertising, mailer pages and brand managers which are costs customarily paid by the studios themselves .... ” Am. Compl. ¶ 72. Insisting on a sales force that promotes one manufacturer’s product over another is exactly the sort of arrangement that generates interbrand competition that benefits the market.
 
 See, e.g., Hendricks Music Co. v. Steinway, Inc.,
 
 689 F.Supp. 1501, 1514 (N.D.Ill.1988). The existence of this procompetitive effect is enough to take this ease out of the category of a
 
 per se
 
 unlawful group boycott and into the realm of rule of reason analysis.
 
 See Bogan,
 
 166 F.3d at 514 (“Absent a showing that a presumption of anticompetitive effect is appropriate, we apply the rule of reason.”).
 

 The cases cited by plaintiffs do not suggest a contrary result.
 
 General Motors, Big Apple BMW, Klor’s
 
 and
 
 Rossi
 
 all in
 
 *CDXXXI
 
 volved manifestly anticompetitive behavior on the part of the defendants to eliminate a price-cutting competitor. As the
 
 Rossi
 
 court summarized, “[t]he common principle we glean from
 
 [General Motors, Big Apple BMW
 
 and
 
 Klor’s
 
 ] is that a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their
 
 price-cutting
 
 competition by cutting his access to supplies.”
 
 Rossi,
 
 156 F.3d at 462 (emphasis added). In applying this principle to the facts of that case, the
 
 Rossi
 
 court once again reiterated that the fact that defendants were “driving a price-cutting competitor out of business” was critical to its decision that application of the
 
 per se
 
 rule was appropriate.
 
 Id.
 
 at 464. Here, by contrast, plaintiffs have made no allegations that they were price-cutters. Accordingly, these cases do not support their contention that the Court should apply the
 
 per se
 
 rule. Indeed, there is nothing in these cases that demonstrates to the Court that the alleged agreements between Universal, Ingram and VPD should be analyzed as anything other than a “presumptively legal” exclusive distributorship arrangement.
 

 Finally, it is worth noting that plaintiffs’ other allegations do not counsel in favor of applying the
 
 per se
 
 rule. For example, there is nothing inherently suspect about the alleged meeting between the defendants at the Broadmoor Hotel. Manufacturers who wish to create an exclusive distributorship must be allowed to communicate with those distributors who will be a part of the distribution scheme.
 
 See Business Electronics,
 
 485 U.S. at 726, 108 S.Ct. 1515 (courts should not find evidence of an antitrust violation in “legitimate communication between a manufacturer and its distributors”). Moreover, it is not even inappropriate, absent evidence of price-fixing, if the impetus for the exclusive distributorship came from the distributors, rather than the manufacturer.
 
 See, e.g., Electronics Communications,
 
 129 F.3d at 245. Finally, there is nothing inherently improper about defendants’ alleged efforts “to prevent retailers and foreign distributors from selling Universal [p]roduct to the plaintiffs.” Am. Compl. ¶ 76(e). Vertical restrictions employed to enforce an exclusive distributorship arrangement, sometimes called “anti-bootlegging” provisions, are not
 
 per se
 
 unlawful and do not convert the arrangement into an impermissible horizontal boycott among distributors.
 
 See Sports Center, Inc. v. Riddell, Inc.,
 
 673 F.2d 786, 791 (5th Cir.1982). For all of these reasons, even assuming the facts in the complaint are true, it would not be appropriate to apply the
 
 per se
 
 rule governing group boycotts to the agreements at issue in this case.
 

 Plaintiffs also fail to allege facts to support a
 
 per se
 
 unlawful price-fixing claim. The decision to terminate a distributor in order to create an exclusive distributorship will be analyzed under the
 
 per se
 
 rule against price-fixing only if there is evidence of “a further agreement on the price or price levels to be charged by the remaining dealer[s].”
 
 Business Electronics,
 
 485 U.S. at 726, 108 S.Ct. 1515. Plaintiffs have not adequately advanced such claims. Plaintiffs do make several conclusory allegations that defendants were engaged in “price-fixing.”
 
 See, e.g.,
 
 Am. Compl. ¶ 53 (“Universal sought to ... fix prices.”), ¶ 87 (“Defendants Ingram and VPD have acquiesced and/or agreed affirmatively and/or impliedly to fix, control, stabilize, maintain or raise prices.”), ¶ 90 (“Universal (as the seller) and Ingram/VPD (as buyers) agreed to fix, control, stabilize and/or raise the prices at which the buyers will resell Universal’s [p]roduct.”). As already stated, “conclusory allegations which merely recite the litany of antitrust ...
 
 *CDXXXII
 
 will [not] suffice.”
 
 Global Disc.,
 
 960 F.Supp. at 704 (quoting
 
 John’s Insulation, Inc. v. Siska Constr. Co.,
 
 774 F.Supp. 156, 163 (S.D.N.Y.1991)). The only factual allegations contained in the complaint that arguably relate to possible price-fixing is that the prices of Universal videos have risen.
 
 See
 
 Am. Compl. ¶¶ 76(h), 85, 86. Plaintiffs specifically allege, as an example, that a Staten Island retailer received a price quote from Ingram for the Universal picture “Family Man” at $10 above cost, whereas the rate for this type of film prior to the defendants’ agreements would have been approximately $1 above cost.
 
 Id.
 
 ¶ 86. However, alleging that prices have risen is not the same as alleging that there is a separate agreement on price levels between Universal, Ingram and VPD. As the Supreme Court noted in
 
 Business Electronics,
 
 virtually all vertical restraints “can be attacked as designed to allow existing dealers to charge higher prices.”
 
 Business Electronics,
 
 485 U.S. at 728, 108 S.Ct. 1515. It was for this very reason that the Supreme Court required a showing of an additional agreement on price levels for the
 
 per se
 
 rule to apply.
 
 See id.
 
 (if all agreements that spawned price increases were
 
 per se
 
 illegal “[mjanufactur-ers would be likely to forgo legitimate and competitively useful conduct rather than risk [antitrust damages]”). Plaintiffs have not alleged sufficient facts to establish that any such agreement existed. Accordingly, the Court finds no basis in the complaint to allow plaintiffs’ Section 1 claim to proceed under a theory of
 
 per se
 
 price-fixing.
 

 2. Rule of Reason
 

 The Court now focuses on whether the plaintiffs have adequately alleged a violation of Section 1 under the rule of reason. Defendants assert that plaintiffs’ allegations are insufficient for two reasons. First, they argue that plaintiffs have failed to adequately define a relevant market, without which it is impossible to assess any potential anticompetitive effects. Second, defendants maintain that, even if plaintiffs have sufficiently alleged a relevant market, the facts they have alleged do not establish that there has been any anticompetitive effect on the market as a whole. Rather, defendants assert that the only effect on the market that plaintiffs have alluded to is that the prices of Universal videos have risen. According to defendants, this establishes at most that the exclusive distributorship arrangement may have reduced
 
 intra
 
 brand competition, as opposed to
 
 inter broad
 
 competition, which is what antitrust law is designed to protect. Thus, defendants argue that absent any factual allegations in the complaint establishing that the agreements harmed interbrand competition, plaintiffs’ rule of reason claim must be dismissed.
 

 In order for the claim to survive, it is essential that plaintiffs properly define a relevant market where the alleged anti-competitive effects are being felt.
 
 See Carell v. Shubert Org., Inc.,
 
 104 F.Supp.2d 236, 264 (S.D.N.Y.2000);
 
 Global Disc.,
 
 960 F.Supp. at 704;
 
 Re-Alco Indus., Inc. v. Nat’l Ctr. For Health Educ., Inc.,
 
 812 F.Supp. 387, 391 (S.D.N.Y.1993). The alleged product market “must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes' — -analysis of the interchangeability of use or the cross-elasticity of demand — and it must be plausible.”
 
 Todd,
 
 275 F.3d at 200 (internal quotation marks and citations omitted).
 
 [5]
 
 Dismissal pursu
 
 *CDXXXIII
 
 ant to Rule 12(b)(6) is therefore appropriate “[i]f a complaint fails to allege facts regarding substitute products, to distinguish among apparently comparable products, or to allege other pertinent facts relating to the cross-elasticity of demand.”
 
 Re-Alco,
 
 812 F.Supp. at 391;
 
 accord Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,
 
 142 F.Supp.2d 296, 303 (E.D.N.Y.2001);
 
 Carell,
 
 104 F.Supp.2d at 264;
 
 Global Disc.,
 
 960 F.Supp. at 705. At the same time, courts must remember that “market definition is a deeply fact-intensive inquiry,” and thus courts should “hesitate to grant motions to dismiss for failure to plead a relevant product market.”
 
 Todd,
 
 275 F.3d at 199-200;
 
 see also PepsiCo, Inc. v. Coca-Cola Co., Inc.,
 
 No. 98 Civ. 3282, 1998 WL 547088, at *6 (S.D.N.Y. Aug.27, 1998) (because defining a relevant market involves a factual inquiry, “[m]otions to dismiss in this context ... may be granted only if the alleged market makes no economic sense under any set of facts”) (internal quotation marks omitted). In general, courts have granted dismissals for failure to allege a relevant market in eases that have involved “(1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.”
 
 Todd,
 
 275 F.3d at 200.
 

 In this case, plaintiffs suggest several possible markets. Many of these fall into the first category of insufficient allegations outlined in
 
 Todd.
 
 For example, in their brief and at oral argument, plaintiffs attempted to argue that “[a] single movie” or “a single supplier’s movies” can be a market. Pis.’ Mem. of Law in Opp. at 20; Tr. of Oral Argument at 26-27. Plaintiffs assert that because each movie is a unique product, it has no adequate substitute, and therefore defendants are immune to the downward pressure on price caused by interbrand competition, which in a properly functioning market, would lead consumers to switch brands in response to an increase in price. By way of example, plaintiffs contend that if consumers wanted to see “Jaws” (a Universal movie) on video, they would not be content to rent “Piranha” (not a Universal movie) instead simply because they are both movies about killer fish. Am. Compl. ¶ 23.
 

 This is exactly the sort of argument courts have routinely rejected in the past.
 
 See, e.g., Hack v. President & Fellows of Yale Coll.,
 
 237 F.3d 81, 86-87 (2d Cir.2000) (finding that although a Yale education is undoubtedly unique, there are many colleges and universities that provide top quality education which plaintiffs could have selected);
 
 Carell,
 
 104 F.Supp.2d at 264-66 (the make-up designs and other intellectual property from the musical “Cats,” though unique, do not constitute their own market);
 
 Theatre Party Assocs. Inc. v. Shubert Org., Inc.,
 
 695 F.Supp. 150, 154-55 (S.D.N.Y.1988) (finding no plausible explanation “why other forms of entertainment, namely other Broadway shows ... are not adequate substitute products [for ‘Phantom of the Opera’]”);
 
 see also Global Disc.,
 
 960 F.Supp. at 705 (finding that plaintiffs contention that a consumer “is ‘locked into’ Pepsi because she prefers the taste, or NBC because she prefers ‘Friends,’ ‘Seinfeld,’ and ‘E.R.’ ” was unconvincing). That each movie is unique is undisputed. However, as these cases indicate, the simple fact that a particular product is unique does not mean that it is its own market.
 
 See Carell,
 
 104 F.Supp.2d at
 
 *CDXXXIV
 
 265 (plaintiff must allege “a plausible basis for finding the [specific product] is a ‘market unto [itself]')”. “Jaws” is no more unique to movie enthusiasts than “Phantom of the Opera” is to theater patrons. Although a particular customer may have his heart set on renting “Jaws,” it is highly likely that, if it is unavailable, he will select a different title, perhaps one that does not even involve killer fish at all. Thus, the Court finds that plaintiffs have failed to support their contention that each Universal video constitutes a relevant market.
 
 [6]
 
 For similar reasons, the Court also rejects plaintiffs’ attempts to define the relevant market as all movies produced by Universal.
 
 See Carell,
 
 104 F.Supp.2d at 265 (“[T]he law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market.”);
 
 accord Global Disc.,
 
 960 F.Supp. at 705;
 
 Re-Alco,
 
 812 F.Supp. at 391.
 

 Despite these failed attempts, the Court finds that plaintiffs’ complaint, read broadly, does identify a relevant market. Although the complaint does not specifically mention a “relevant product market,” or devote a particular section to defining its parameters, the complaint does reference “the rental and ‘sell-through’ home video and DVD markets in the United States,” Am. Compl. ¶ 19, “the wholesale distribution market for ‘sell-through’ and rental movie videos and DVDs in the United States,”
 
 id.
 
 ¶22, and “the video rental market channeled through wholesale distributors.”
 
 Id.
 
 ¶ 28. Taken together, these references do comprise a potentially viable relevant market, best summarized in paragraph 22 as “the wholesale distribution market for ‘sell-through’ and rental movie videos and DVDs in the United States.”
 
 Id.
 
 ¶ 22.
 

 Identifying the contours of the relevant market, however, is only the first step of the process. Plaintiffs must also address why certain products are not adequate substitutes, and are thus not part of the relevant market.
 
 See, e.g., Todd,
 
 275 F.3d at 200 (complaint must address “interchangeability of use or the cross-elasticity of demand” to adequately allege a relevant market). As the complaint defines the relevant market as all videos and DVDs sold by wholesalers in the United States, defendants contend that plaintiffs, at a bare minimum, must discuss why the manufacturers (i.e., the studios) themselves are not contained within this market. Defendants argue that because the studios engage in direct marketing of their films, as well as marketing through distributors, plaintiffs must address why retail video shops would not buy their movies directly from the studios if the distributors raised their prices. According to defendants, the complaint fails to do this.
 

 The court does not agree. Plaintiffs have alleged that “[i]n order to save time and expense, retailers historically tend to purchase product from those wholesale distributors that are capable of supplying all product available through wholesale distribution as opposed to purchasing product piece-meal from different wholesale distributors.” Am. Compl. ¶ 39. Thus, plaintiffs have posited that retailers engage in a form of “one-stop shopping” in
 
 *CDXXXV
 
 purchasing their videos, and that there are compelling business reasons for doing so. Although the complaint does not specifically indicate that it would be prohibitively expensive for a retailer to begin buying directly from a studio, plaintiffs have provided at least a “plausible” reason why retailers would not respond to an increase in the prices charged by wholesale distributors by switching to direct dealing with the studios.
 
 See Todd,
 
 275 F.3d at 200 (to survive a motion to dismiss, a plaintiff must provide a “plausible explanation as to why a market should be limited in a particular way”).
 
 [7]
 

 In this respect, this case is similar to
 
 PepsiCo.
 
 In that case, PepsiCo accused Coca-Cola of actual or attempted monopolization of the fountain-dispensed soft-drink industry.
 
 See PepsiCo.
 
 1998 WL 547088, at *4. In its complaint, PepsiCo defined the relevant product market “not [as] the market for soft-drinks, or fountain-dispensed soft drinks, but rather [as] the market for ‘fountain-dispensed soft drinks’
 
 distributed through foodservice distributors.” Id.
 
 at *9 (emphasis in original). In response to Coca-Cola’s argument that PepsiCo had failed to allege a relevant market by limiting it in this way, the court found that “the complaint posits that the buyers in question have real efficiency-based reasons to take delivery of all of their supplies, including fountain syrup, from foodservice distributors; the complaint maintains that for these customers delivery through other means simply will not do.”
 
 Id.
 
 So, too, in this case, plaintiffs have alleged an efficiency-based reason for looking to wholesale distributors to supply all of their videos.
 
 [8]
 
 Hence, this is not a case where the plaintiffs have entirely failed to explain why certain alternative sources of supply are not part of the relevant market.
 
 See Beyer Farms,
 
 142 F.Supp.2d at 303-04. In so finding, however, the Court expresses no opinion as to whether the market, as alleged by plaintiffs, is ultimately viable or not. Indeed, plaintiffs have a difficult task before them. Nevertheless, the Court’s focus at this stage is on the complaint alone, and while plaintiffs’ presentation on the issue is admittedly thin, the Court cannot say that they have failed to allege a relevant product market.
 

 To state a claim for a rule of reason violation under Section 1, a plaintiff must also allege that “the challenged action has had an
 
 actual
 
 adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.”
 
 Tops Markets, Inc. v. Quality Markets, Inc.,
 
 142 F.3d 90, 96 (2d Cir.1998) (quoting
 
 *CDXXXVI
 

 Capital Imaging,
 
 996 F.2d at 543);
 
 accord K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,
 
 61 F.3d 123, 127 (2d Cir.1995). Stated differently, “[t]he Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market .... ”
 
 Tops Markets,
 
 142 F.3d at 96. Furthermore, a plaintiff must also allege “more than just an adverse effect on competition among different sellers of the same product (‘intrabrand’ competition) .... ”
 
 K.M.B. Warehouse,
 
 61 F.3d at 127;
 
 Electronics Communications,
 
 129 F.3d at 245. Rather, a plaintiff must demonstrate that the challenged actions “diminish overall competition, and hence consumer welfare.”
 
 K.M.B. Warehouse,
 
 61 F.3d at 128 (quoting
 
 Graphic Prods. Distribs. v. Itek Corp.,
 
 717 F.2d 1560, 1571, 1573 (11th Cir.1983)). A plaintiff can demonstrate an adverse effect on competition in one of two ways. Either it can show “an actual adverse effect on competition, such as reduced output,” or it can “demonstrate[ ] ‘adverse effect’ indirectly by establishing that [defendant] had sufficient market power to cause an adverse effect on competition.”
 
 Tops Markets,
 
 142 F.3d at 96. If a plaintiff uses the latter method, however, they must allege more than just market power, but also that “[t]here ... [are] other grounds to believe that the defendant’s behavior will harm competition market-wide, such as the inherently anticompeti-tive nature of defendant’s behavior or the structure of the interbrand market.”
 
 K.M.B. Warehouse,
 
 61 F.3d at 129.
 

 Here, defendants argue that plaintiffs have alleged only that the prices of Universal videos have increased, and therefore they have not alleged any harm to interbrand competition. The Court disagrees. Plaintiffs’ complaint contains the following allegation, “[t]he price affect [sic] that the defendants’ actions have and will have on the video and DVD industry is corroborated by numerous video retailers, including those represented by the Pudget Sound Alliance, Video One Buying Group and New England Buying Group, who have acknowledged the detrimental affect [sic] on market prices resulting from the fact that the Universal agreements with Ingram, VPD and Valley has made the industry non-competitive.” Am. Compl. ¶ 85. This allegation does not specifically limit itself to the prices of Universal videos alone, but rather seems to indicate that the prices of all videos have been rising since the creation of the challenged agreements. Thus, plaintiffs have indeed alleged an actual injury to interbrand competition.
 

 Nevertheless, even assuming that defendants are correct that only the prices of Universal videos are rising and that, as a result, the restrictions are strictly intra-brand, the Court is not convinced that such a trend could never give rise to an antitrust violation. Though undoubtedly more focused on protecting interbrand competition, antitrust laws are not entirely unconcerned with intrabrand restraints. As the Eleventh Circuit stated in
 
 Graphic Products:
 

 The argument ... that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intra-brand competition — regardless of the circumstances — is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the inter-brand market — whether stemming from its dominant position in the market structure or from successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare
 
 *CDXXXVII
 
 because it alone can exert downward pressure on the retail price at which the good is sold.
 

 Graphic Prods.,
 
 717 F.2d at 1572 n. 20. In this case, plaintiffs have alleged that Ingram and VPD combined have a significant market share of 75% of the wholesale video and DVD distribution market, indicating substantial market power.
 
 See K.M.B. Warehouse,
 
 61 F.3d at 129 (“[M]arket share may be used as a proxy for market power.”). Moreover, plaintiffs have alleged that Ingram and VPD stand to gain an ascendent position in the wholesale video distribution market by virtue of their exclusive right to sell Universal videos.
 
 See
 
 Am. Compl. ¶ 43 (“Without access to the supply of product from a major studio, such as Universal, a wholesale distributor will lose a substantial amount of its customers.”). Thus, the structure of the interbrand market for wholesale videos may indeed be such that intrabrand competition is necessary to avert market-wide anticompetitive effects.
 
 See Graphic Prods.,
 
 717 F.2d at 1572 n. 20.
 

 Defendants contend that if prices of Universal videos go up, retailers either will decide to take advantage of the higher prices by purchasing more copies and marketing them to customers more aggressively in order to reap higher returns, or will simply elect to buy fewer copies of Universal films, and push lower-priced brands.
 
 See
 
 V.P.D. Reply Brief at 9. This may indeed be the case. Nevertheless, a court may dismiss a complaint only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Todd,
 
 275 F.3d at 197-98 (quoting
 
 Conley,
 
 355 U.S. at 45-46, 78 S.Ct. 99). At this point in the litigation, there is at least a possibility that plaintiffs will be able to demonstrate a rule of reason violation. Accordingly, the Court must allow them to proceed with this claim.
 

 B. Section 2 of the Sherman Act
 

 Section 2 of the Sherman Act states in pertinent part:
 

 Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony.
 

 15 U.S.C. § 2. As is apparent from the language of the statute, Section 2 of the Sherman Act prohibits three separate offenses: monopolization, attempted monopolization, and conspiracy to monopolize.
 
 See Spectrum Sports, Inc. v. McQuillan,
 
 506 U.S. 447, 454, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). To state a claim for monopolization, plaintiffs must allege “(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.”
 
 United States v. Grinnell Corp.,
 
 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966);
 
 Clorox Co. v. Sterling Winthrop, Inc.,
 
 117 F.3d 50, 61 (2d Cir.1997). To state a claim for attempted monopolization, plaintiffs must allege “(1) that the defendant has engaged in predatory or anticom-petitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.”
 
 Spectrum Sports,
 
 506 U.S. at 456, 113 S.Ct. 884;
 
 Tops Markets,
 
 142 F.3d at 99-100. In determining whether there is a “dangerous probability” of success, courts must evaluate “defendant’s economic power in the relevant market.”
 
 Id.
 
 at 100. Finally, to state a claim for conspiracy to monopolize, plaintiffs must allege “(1) concerted action, (2) overt acts in furtherance of the conspir
 
 *CDXXXVIII
 
 acy, and (3) specific intent to monopolize.”
 
 Santana Prods., Inc. v. Sylvester & Assocs., Ltd.,
 
 121 F.Supp.2d 729 (E.D.N.Y.1999).
 

 Plaintiffs maintain that they have alleged facts to support all three claims. In response, defendants first argue that plaintiffs’ Section 2 claims must be dismissed because they have failed to allege a relevant market for the same reasons expressed in defendants’ challenge to their Section 1 claims. As the Court has determined that plaintiffs’ complaint sufficiently alleges a relevant market, this argument is unavailing. Nevertheless, defendants’ alternative argument — that the Section 2 claims must be dismissed because they allege, at most, a “shared monopoly” between Ingram and VPD — is persuasive. Defendants correctly point out that neither Universal, Ingram nor VPD individually can be considered to have monopoly power in the relevant market. Universal is only one of six major studios who supply movies to wholesale video distributors.
 
 [9]
 
 Plaintiffs allege that Ingram has a market share of roughly 50% of the wholesale video distribution market, while VPD has approximately a 25% market share. Am. Compl. ¶¶ 101-02. It is only when their market shares are combined to reach roughly 75% does the percentage approach a level that may give rise to an inference of market power necessary to sustain a Section 2 claim.
 
 See Tops Markets,
 
 142 F.3d at 99 (quoting
 
 Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.,
 
 651 F.2d 122, 129 (2d Cir.1981) (“Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.”)). Moreover, while not specifically mentioning the term “shared monopoly,” a fair reading of the complaint indicates that plaintiffs’ Section 2 claims are framed in terms of a “shared monopoly.”
 
 See
 
 Am. Compl. ¶ 107 (“Upon information and belief, Ingram and VPD will soon control nearly all of the U.S. video rental market .... ”). Accordingly, the success of plaintiffs’ Section 2 claims rises and falls on the viability of the “shared monopoly” theory.
 

 The idea of a “shared monopoly” giving rise to Section 2 liability repeatedly has been received with skepticism by courts who have squarely addressed the issue.
 
 See, e.g., Santana Prods.,
 
 121 F.Supp.2d at 737-38 (rejecting plaintiffs claim of conspiracy to form a shared monopoly);
 
 Sun Dun, Inc. of Washington v. Coca-Cola Co.,
 
 740 F.Supp. 381 (D.Md.1990) (noting that the idea of a “shared monopoly” giving rise to Section 2 liability is contrary to the legislative history of the Sherman Act which indicates that “the concept of ‘monopoly’ did not include ‘shared monopolies’ or ‘oligopolies’ at all, but rather the complete domination of a market by a
 
 single
 
 economic entity”);
 
 Consol. Terminal Sys., Inc. v. ITT World Communications, Inc.,
 
 535 F.Supp. 225 (S.D.N.Y.1982) (rejecting outright the argument that a “shared monopoly” can give rise to a Section 2 violation). Thus, while some learned eommen-
 
 *CDXXXIX
 
 tators have advanced the argument that Section 2 may be invoked against “shared monopolies” in certain situations,
 
 see
 
 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 810 (1996) (cited in
 
 Santana Prods.,
 
 121 F.Supp.2d at 737), courts have yet to embrace this theory.
 

 With respect to plaintiffs’ claims of actual or attempted monopolization, the Second Circuit has specifically indicated that it will not entertain arguments based on a “shared monopoly” theory of liability.
 
 See H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,
 
 879 F.2d 1005 (2d Cir.1989) (stating that “the district court correctly concluded that the market shares of [defendants] could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section 2, 15 U.S.C. § 2 (1982)”);
 
 Kramer v. Pollock-Krasner Found.,
 
 890 F.Supp. 250, 256 (S.D.N.Y.1995) (citing
 
 Hayden
 
 for the proposition that “allegations of a shared monopoly, i.e., that the defendants’ combined market power constitutes monopolization or attempted monopolization of the relevant market ... do not constitute a violation of Section 2”);
 
 see also Consol. Terminal,
 
 535 F.Supp. at 228-29 (“[A]n oligopoly, or a shared monopoly, does not itself violate § 2 of the Sherman Act. Rather, in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a particular defendant.”). Hence, these claims must be dismissed.
 

 The Second Circuit has not squarely addressed the question of whether a “shared monopoly” theory of liability is viable in the context of a claim of conspiracy to monopolize.
 
 See Santana Prods.,
 
 121 F.Supp.2d at 737. Those courts that have considered this issue have expressed similar doubts as to its persuasiveness, but have stopped short of rejecting it entirely. The court in
 
 Sun Dun
 
 stated that a claim of conspiracy to form a shared monopoly may be viable “if the aim of the conspiracy is to form a single entity to possess the illegal market power.”
 
 Sun Dun,
 
 740 F.Supp. at 391-92. The court in
 
 Santana Products
 
 took a somewhat broader view, stating that “a claim for conspiracy to monopolize may also be stated where two or more competitors seek to allocate a market and exclude competitors, even if they do not form a single corporate entity.”
 
 Santana Prods.,
 
 121 F.Supp.2d at 740 n. 1. In this case, plaintiffs have alleged that “[u]pon information and belief, Ingram and VPD have entered into agreements not to compete with each other over certain large customer accounts.” Am. Compl. ¶ 105. Even if the Court were to adopt the broader view of
 
 Santana Products,
 
 alleging that Ingram and VPD agreed to diwy up a few accounts is not the same as alleging that they agreed to allocate the entire wholesale video and DVD distribution market amongst themselves. The allegations are therefore insufficient to allege a claim of conspiracy to form a “shared monopoly” even under the most permissive interpretation of the theory’s viability. Accordingly, the Court dismisses this claim.
 

 C. Robinson-Patman Act
 

 Plaintiffs allege several claims under the Robinson-Patman Act. First, plaintiffs assert that Universal violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by selling its product to plaintiffs’ competitors at a lower price than it charged plaintiffs. Second, plaintiffs allege that Universal violated sections 2(d) and 2(e) of the Robinson-Patman Act, 15 U.S.C. §§ 13(d)
 
 &
 
 (e), by providing subsidies, incentives and other forms of preferential treatment to plaintiffs’ competitors that were not made available to plaintiffs. Finally, plaintiffs claim that Ingram and VPD violated section 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), by know
 
 *CDXL
 
 ingly inducing and receiving discriminatory prices on Universal product.
 

 1. Section 2(a)
 

 Plaintiffs’ section 2(a) claim involves allegations of secondary-line price discrimination.
 
 [10]
 
 In order to state a claim of secondary-line price discrimination under section 2(a), plaintiffs must establish four facts: “(1) that seller’s sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition.”
 
 George Haug Co. v. Rolls Royce Motor Cars Inc.,
 
 148 F.3d 136, 141 (2d Cir.1998). A prohibited effect on competition may be inferred from evidence that an individual competitor suffered injury from “a substantial price difference over time.”
 
 Id.
 
 at 142 (discussing
 
 FTC v. Morton Salt Co.,
 
 334 U.S. 37, 46-47, 68 S.Ct. 822, 92 L.Ed. 1196 (1948)).
 

 Defendants make several arguments that the pleadings are inadequate to state a price discrimination claim. While there is no question that the pleadings are thin with respect to the price discrimination claims; the Court finds that they ultimately survive. Defendants first assert that plaintiffs have not established “a clear link between the timing and location of any competition and the timing and location of the alleged price discrimination.”
 
 United Magazine Co. v. Murdoch Magazines Distribution, Inc.,
 
 146 F.Supp.2d 385, 396 (S.D.N.Y.2001). In
 
 Murdoch,
 
 the various competitors each had a distinct territory in which they operated. Because the plaintiffs lumped together all of the defendants in their allegations, it was unclear whether the plaintiffs did in fact compete with any particular defendant. Hence, the Court concluded that plaintiffs had to be more specific as to the timing and location of the alleged price discrimination in order to state a claim under the Robinson-Patman Act. In this case, it is clear that plaintiffs were competitors of Ingram and VPD in the national market for wholesale video distribution. Plaintiffs therefore need not be any more specific than they already have with respect to this point.
 

 Defendants also argue that plaintiffs have not adequately alleged that the products at issue were of “like grade and quality.” Defendants attempt to use plaintiffs’ own theory of the case against them by asserting that if, as plaintiffs claim, each video is a unique product, plaintiffs must then allege that Universal charged different distributors different prices for individual, specific movies. Plaintiffs instead have included only general allegations that Universal sold “its product” at lower prices to plaintiffs’ competitors.
 

 Although this is a clever argument, the Court has already rejected the notion that each video is a unique product. Moreover, it appears from the language “its product” that plaintiffs are alleging that
 
 all
 
 of the products Universal made available to wholesale distributors it sold to Ingram and VPD at lower prices. It seems indisputable that the “grade and quality” of the entire Universal video collection made available to one wholesale distributor is of the same grade and quality as the entirety made available to another wholesale dis
 
 *CDXLI
 
 tributor-indeed, it is the same collection of Universal videos. Accordingly, this argument fails.
 

 Finally, defendants claim that plaintiffs have not adequately alleged that the purported price discrimination was “sustained and substantial.” In
 
 Haug,
 
 the Court found that it was necessary for a complaint to allege a “substantial and sustained price differential” to survive a motion to dismiss.
 
 Haug,
 
 148 F.3d at 144. However, the court did not find this requirement to be onerous. While the plaintiff in
 
 Haug
 
 “[did] not detail the amount and degree of the price discrimination,” it did allege that it was “injured during the 4 years prior to its termination.”
 
 Haug,
 
 148 F.3d at 144 (internal quotations omitted). Such a recitation was deemed “adequate to withstand Fed.R.Civ.P. 12(b)(6) dismissal.”
 
 Ibid.
 

 Plaintiffs allege that “[f]or a period of several years, on more than two occasions and to more than one distributor, including but not necessarily limited to the period of approximately 1998-2000, Universal sold its product to wholesale distributors at a cheaper price than sold to the plaintiffs.” Compl. ¶ 141. The complaint also states that “[plaintiffs’ cost for Universal [product was significantly higher than their competition due to Universal’s unfair treatment.” Compl. ¶ 143. Such statements seem to describe price discrimination that is at least as “sustained and substantial” as that detailed in
 
 Haug.
 
 It is therefore sufficient to withstand a motion to dismiss.
 

 2. Sections 2(d) and 2(e)
 

 Sections 2(d) and 2(e) of the Robinson-Patman Act “prohibit indirect price discrimination in the form of advertising and other promotional allowances made available to purchasers on disproportionate terms.”
 
 Haug,
 
 148 F.3d at 144. Plaintiffs allege that Universal paid Ingram and VPD more money to advertise its product and offered them rebates and incentive programs that were not offered to plaintiffs,
 
 see
 
 Compl. ¶¶ 142-44. Defendants argue that plaintiffs have not specifically alleged that any benefit Universal provided to Ingram and VPD was not also made available to plaintiffs on the same terms. Plaintiffs simply may not have availed themselves of the benefits, qualified for volume discounts by purchasing enough product, or purchased the products that had the largest promotions, defendants suggest. Def. Universal’s Memo of Law at 20. Citing
 
 Bouldis v. U.S. Suzuki Motor,
 
 defendants assert that a plaintiff who does not take advantage of such promotions or who fails to satisfy the requirements for obtaining these concessions cannot make out a price discrimination claim.
 
 Bouldis v. U.S. Suzuki Motor Corp.,
 
 711 F.2d 1319, 1326 (6th Cir.1983).
 

 Defendants are correct in their assertion of the law.
 
 [11]
 
 However, their characterization of plaintiffs’ pleading is not entirely accurate. Plaintiffs have in fact stated with specificity that concessions made available to Ingram and VPD were not made available to them. In their description of the Universal rebate program in which they participated, for example, plaintiffs state that “if other distributors failed to achieve the goal for entitlement to the rebate, these distributors were afforded rebates
 
 at times when plaintiffs were
 
 
 *CDXLII
 

 not.”
 
 Amend. Comp. ¶ 142(b) (emphasis added). In the next paragraph, they describe being shut out of another program: “Universal also gave programs to plaintiffs’ competitors in which if the competitors reached a certain level of sales they get a certain amount of money per tape. These so-called ‘focus programs’ were not given to the plaintiffs.” Amend. Complaint ¶ 142(c). Lastly, they allege that “Universal gave a disproportionate amount of ‘free goods’ to plaintiffs’ competitors.” Amend. Comp. ¶ 142(e).
 

 As the wording of each of these allegations suggests, these were programs and benefits that plaintiffs believed they were equally qualified for and entitled to, but which were not made available to them on an equal basis. Defendants present the possibility that plaintiffs were not entitled to these benefits; however, at the motion to dismiss stage, such factual arguments are inapposite. Plaintiffs simply need to satisfy the pleading requirements of alleging that these allowances and reimbursements were not made available to them on a “proportionally equal basis.” 15 U.S.C. § 13(d);
 
 O’Connell v. Citrus Bowl,
 
 99 F.R.D. 117, *120 (E.D.N.Y.1983). Plaintiffs have satisfied this burden. As a result, this claim also survives the motion to dismiss.
 

 3. Section 2(f)
 

 In order for a buyer such as Ingram or VPD to be liable under section 2(f) for receiving an illegal price discrimination, plaintiffs must first show that the seller is liable under section 2(a).
 
 See Great Atl. & Pac. Tea Co., Inc. v. FTC,
 
 440 U.S. 69, 77, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). Having adequately alleged a section 2(a) claim against Universal, plaintiffs must show that Ingram and VPD “knowingly [induced] or receive[d] a discrimination in price which is prohibited.” 15 U.S.C. § 13(f). The knowledge requirement may be satisfied by showing that the buyer had “either actual knowledge, i.e., he or she must have known that the price in question was illegal, or constructive knowledge, i.e., he or she must have been reasonably cognizant of its illegality.”
 
 Hygrade Milk & Cream Co. v. Tropicana Prods., Inc.,
 
 No. 88 Civ. 2861, 1994 WL 38549, at *3 (S.D.N.Y. Feb.4, 1994) (citing
 
 Automatic Canteen Co. v. FTC,
 
 346 U.S. 61, 79-80, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953)).
 

 As to this claim, the language of the plaintiffs’ complaint is admittedly thin, straying into the realm of conclusory statements that do little more than parrot the language of the statute. Plaintiffs only allege the following: “VPD and Ingram knowingly induced Universal and/or received a discrimination in price in violation of 15 U.S.C.A. Section 13.” Compl. ¶ 146. Plaintiffs do not specifically state how the Court might infer knowledge of the price discrimination from Ingram and VPD’s “trade experience” or other behavior.
 
 See Automatic Canteen,
 
 346 U.S. at 79-82, 73 S.Ct. 1017. Nevertheless, it is well settled that a court should dismiss a complaint under Rule 12(b)(6) only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Todd,
 
 275 F.3d at 197-98. Plaintiffs’ claim does not appear so bare or meritless as to fail this minimal test. Indeed, when considering plaintiffs’ 2(f) claim together with the totality of the complaint, it seems plausible to the Court that plaintiffs could adduce evidence of Ingram and VPD’s knowing receipt of lower-priced videos from Universal. Plaintiffs’ allegation earlier in the complaint that Ingram and VPD “jointly control in excess of 75% of the video rental market channeled through distributors” (Amend.Comp^ 29) certainly bespeaks a significant degree of “trade experience,”
 
 *CDXLIII
 
 and the allegation that “[f]or a period of several years, defendants Ingram and VPD encouraged and applied pressure on Universal to make them exclusive distributors of Universal [p]roduet in the U.S. rental market, at the exclusion of the Plaintiffs” suggests that Ingram and VPD acted intentionally to induce preferred status with Universal. Drawing all inferences in favor of the plaintiff, the Court concludes that these allegations collectively are sufficient for the 2(f) claim to survive a motion to dismiss.
 
 [12]
 

 D. State Law Claims
 

 Plaintiffs also allege that defendants committed common law fraud and misrepresentation, tortious interference with business contracts, and breach of contract. Defendants assert that plaintiffs have failed to state claims in each of these areas.
 

 1. Fraud and Misrepresentation
 

 Plaintiffs allege that in an effort “to gain unfair advantage over its competitors and to assist Ingram, VPD and Valley to gain market share over plaintiffs,” defendant Universal fraudulently induced plaintiffs to turn over confidential customer information. Amend. Compl. ¶ 117. On August 28, 2000, Universal purportedly e-mailed plaintiffs requesting substantial information about plaintiffs’ retail customers, including sales totals, units sold, gross and net revenues and returns. Amend. Comp. ¶ 114. Universal told plaintiffs that it was soliciting such information for the purpose of “better understanding our business” and “to better evaluate our goal setting process so that we can set more accurate BPIs [i.e., percentage of Universal’s business by the distributor] for you on our future promotions.” Amend. Comp. ¶ 115. The complaint alleges that this proffered purpose was false. Amend. Comp. ¶ 116. The true purpose was to facilitate defendants Ingram and VPD in their goal of “weakening or eliminating Flash and ETD as wholesale distributors in the video and DVD market.” Amend. Comp. ¶ 120. Indeed, after plaintiffs relied on Universal’s statement and provided the requested information to Universal, the complaint alleges that Ingram and VPD began contacting plaintiffs’ customers, who were previously unknown to them, and solicited their business. Amend Comp. ¶ 122. Defendants Ingram and VPD moreover informed plaintiffs’ custom
 
 *CDXLIV
 
 ers that plaintiffs were no longer authorized to supply Universal products even during a time when plaintiffs’ contracts with Universal were still intact. Amend. Comp. ¶¶ 122-23. As a result of all of these actions by defendants, plaintiffs allege that they suffered loss of customers and damage to their reputation. Amend. Comp. ¶¶ 124-25.
 

 Defendant Universal does not contest the sufficiency of this claim in their motion to dismiss. The more difficult question is whether plaintiffs have adequately stated a claim of fraud and misrepresentation against defendants Ingram and VPD. Ingram and VPD have contested the sufficiency of plaintiffs’ fraud claims, arguing that plaintiffs have not alleged any facts indicating that either of them engaged in, induced or authorized the alleged fraud or misrepresentation.
 

 Under New York law, to hold a defendant liable for fraud, a plaintiff must prove four elements: (1) a misrepresentation or a material omission of fact which was false and known to be false by defendant; (2) made for the purpose of inducing the other party to rely upon it: (3) justifiable reliance of the other party on the misrepresentation or material omission; and (4) injury.
 
 See AUSA Life Ins. Co. v. Ernst and Young,
 
 206 F.3d 202, 208 (2d Cir.2000) (citing
 
 Lama Holding Co. v. Smith Barney, Inc., 88
 
 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)). Fraud actions are also subject to the heightened pleading requirements of Rule 9(b), which require that “the circumstances constituting fraud or mistake.. .be stated with particularity.” Fed.R.Civ.P. 9(b). The elements of knowledge or intent, however, may be alleged generally. Fed.R.Civ.P. 9(b).
 

 To satisfy Rule 9(b)’s particularity requirement, a plaintiffs complaint must: “(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.”
 
 Stevelman v. Alias Research Inc.,
 
 174 F.3d 79, 84 (2d Cir.1999) (quoting
 
 Mills v. Polar Molecular Corp.,
 
 12 F.3d 1170, 1175 (2d Cir.1993)). Moreover, where multiple defendants are involved, the rule requires that the complaint allege facts that specify each defendant’s connection to the fraud.
 
 See DiVittorio v. Equidyne Extractive Indus. Inc.,
 
 822 F.2d 1242, 1247 (2d Cir.1987). It is well-settled that the false representation need not have been made by the defendant personally. “If he authorized and caused it to be made it is the same as though he made it himself.”
 
 Voisin v. Providence Washington Insurance Co.,
 
 51 A.D. 553, 559, 65 N.Y.S. 333 (1st Dep’t 1900), (quoting
 
 Brackett v. Griswold,
 
 112 N.Y. 454, 467, 20 N.E. 376 (3d Dep’t 1889)). However, bare allegations that a defendant “aided, abetted, assisted, connived with and acquiesced in” the fraud are insufficient to state a cause of action.
 
 Halperin v. Lieberman,
 
 271 A.D. 878, 66 N.Y.S.2d 78, 79 (2d Dep’t 1946).
 

 Again drawing all inferences in favor of the plaintiff, this Court finds that plaintiffs have satisfied the pleading requirements regarding Ingram and VPD, albeit barely. Plaintiffs have specified the statements they contend were fraudulent-namely the e-mails requesting customer information for helping plaintiffs with future promotions, identified Universal as the so-called “speaker,” detailed that the statements were made via e-mail on August 28, 2000, and explained why the statements were fraudulent. Furthermore, plaintiffs go beyond bare allegations to describe Ingram and VPD’s connection to the fraud, specifying how Ingram and VPD “conspired to elicit information from the plaintiffs about plaintiffs’ customers
 
 *CDXLV
 
 and... use[d] that information to steal plaintiffs’ clients by using plaintiffs’ customer information to contact and solicit plaintiffs’ customers-” Amend. Comp. ¶ 77(g).
 
 See also
 
 Amend. Comp. ,¶¶ 117, 120-25. Such an allegation of a conspiracy between all three defendants and the subsequent use by Ingram and VPD of the fruits of Universal’s statement suggest that Ingram and VPD prompted Universal to make the fraudulent statement in the first place. As a result, plaintiffs have satisfied their burden of pleading their fraud claim against Ingram and VPD with particularity, and the claim survives the motion to dismiss with respect to all three defendants.
 

 2. Tortious Interference with a Contractual Relationship
 

 Plaintiffs have also asserted a tortious interference claim against all three defendants. According to plaintiffs, defendants Ingram and VPD intentionally induced Universal to breach its dealer/supplier contracts with plaintiffs through two means: 1) by threatening that all wholesale distributors would go out of business due to an oversaturated distributors market if they were not granted exclusive distributorships, leaving Universal with no distributors for its products, and 2) through offers of special treatment if granted the exclusive distributorships. Additionally, all three defendants allegedly used “threats, bribery, defamation and/or coercion” to induce numerous retailer-customers of plaintiffs to terminate their relationships with plaintiffs. Amend. Comp. ¶ 131. As a result, plaintiffs assert that their business contracts were damaged in excess of $30 million. Amend. Comp. ¶¶ 132-33. Defendants maintain that plaintiffs have failed to allege the requisite elements of a tortious interference claim, and therefore their claim should be dismissed.
 

 Under New York law, the elements of a tortious interference claim are: 1) the existence of a valid contract between the plaintiff and a third party; 2) defendant’s knowledge of the contract; 3) defendant’s intentional procurement of the third party’s breach of contract; 4) actual breach of the contract, and 5) damages resulting from the breach.
 
 Trionic Assocs., Inc. v. Harris Corp.,
 
 27 F.Supp.2d 175, 184 (E.D.N.Y.1998),
 
 aff'd,
 
 198 F.3d 235, 1999 WL 822514 (2d Cir.1999);
 
 Lama Holding Co. v. Smith Barney, Inc.,
 
 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (N.Y.1996). Plaintiffs must allege each of these elements in a non-conclusory fashion in their complaint.
 
 World Wide Communications, Inc. v. Rozar,
 
 No. 97 Civ. 1056, 1997 WL 795750, at *6 (S.D.N.Y.1997). If multiple contracts are at issue, the complaint must specify the particular contracts that have been interfered with by defendants.
 
 See Campo v. 1st Nationwide Bank,
 
 857 F.Supp. 264, 273 (E.D.N.Y.1994);
 
 Quail Ridge Assoc. v. Chemical Bank,
 
 162 A.D.2d 917, 558 N.Y.S.2d 655, 658 (3d Dept.),
 
 appeal dismissed,
 
 76 N.Y.2d 936, 563 N.Y.S.2d 64, 564 N.E.2d 674 (1990). The exact level of specificity, however, is not a settled matter.
 
 See World Wide Communications, Inc.,
 
 1997 WL 795750 at *6-7 (holding that the absence of factual allegations as to the underlying contracts, such as the parties to the contracts, the terms of the contracts, and whether or not they were terminable at will, led the court to dismiss the tortious interference claim. However, the Court went on to state: “[W]e do not mean to suggest that all of these facts are necessary given our liberal rules,
 
 see
 
 Fed. R.Civ.P. 8.”). Nevertheless, it is clear that plaintiffs must present at least some specific facts which put defendants on notice as to which contracts they are accused of interfering with.
 

 
 *CDXLVI
 
 Perhaps the thorniest issue in a tortious interference claim is the question of what specifically constitutes improper interference. One begins the analysis by drawing a distinction between interference with existing contracts and interference with prospective contracts or contracts that are terminable at will.
 
 (See
 
 Restatement, Torts 2d, § 768, for the proposition that contracts terminable at will are treated like prospective contractual relations.) It is much easier for a plaintiff to prove improper interference with existing contracts. Plaintiffs simply need to prove the above-stated five elements, and defendants are not afforded the excuse that they were acting as business competitors in procuring the breach.
 
 Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.,
 
 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). Or as
 
 NBT Bancorp
 
 stated, “[WJhere there is an existing, enforceable contract and a defendant’s deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior.”
 
 NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,
 
 87 N.Y.2d 614, 664 N.E.2d 492, 641 N.Y.S.2d 581, 585 (1996).
 
 [13]
 

 There are “more demanding requirements,” however, for proving interference with prospective contractual relations and contracts that are terminable at will.
 
 Guard-Life,
 
 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445. In such contracts, a defendant’s status as a “business competitor” may excuse him from liability for tortious interference, so long as the “interference is intended at least in part to advance the competing interest of the interferer, no unlawful restraint of trade is effected, and the means employed are not wrongful.”
 
 Guard-Life,
 
 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445. ‘Wrongful means” have been further defined as including “physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure” but not “persuasion alone although it is knowingly directed at interference with the contract.”
 
 Guard-Life,
 
 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445,
 
 aff'd. by NBT Bancorp,
 
 87 N.Y.2d 614, 624, 641 N.Y.S.2d 581, 664 N.E.2d 492. Such a differentiation between interference with existing contracts and interference with prospective and terminable contracts has been justified as striking a balance between “respect for individual contract rights” and the “public benefit to be derived from unfettered competition.” Guard
 
 -Life,
 
 50 N.Y.2d at 191, 428 N.Y.S.2d 628, 406 N.E.2d 445.
 

 In applying the law to the facts of our case, we first assess plaintiffs’ contracts with Universal and then plaintiffs’ contracts with their retailer-customers.
 

 a. Plaintiffs’ contracts with Universal
 

 Plaintiffs have generally alleged that all three defendants tortiously inter
 
 *CDXLVII
 
 fered with their dealer/supplier contracts with Universal. As a preliminary matter, this claim as brought against Universal must be dismissed. Indeed, as Universal has correctly asserted, there can be no liability for tortiously interfering with one’s own contract.
 
 See Koret, Inc. v. Christian Dior, S.A.,
 
 161 A.D.2d 156, 554 N.Y.S.2d 867 (1990) (holding that only a stranger to a contract can be liable for tortious interference with that contract);
 
 Kosson v. Algaze,
 
 203 A.D.2d 112, 610 N.Y.S.2d 227, 228 (1994), aff'd, 84 N.Y.2d 1019, 622 N.Y.S.2d 674, 646 N.E.2d 1101 (1995);
 
 Mackie v. La Salle Indus., Inc.,
 
 92 A.D.2d 821, 460 N.Y.S.2d 313, 316 (1983).
 

 However, plaintiffs’ claims against Ingram and VPD survive. To begin, defendants do not dispute that plaintiffs had dealer/supplier contracts with Universal. (In passing, Ingram suggests that plaintiffs have pleaded insufficient factual allegations of the material terms of the contract; however, in light of ¶¶45, 47, 127 and 128 of the Amended Complaint, which detail aspects of plaintiffs’ contract with Universal, the Court rejects this argument.) There is also no dispute that defendants Ingram and VPD knew of plaintiffs’ contracts with Universal, or that there was a breach of such contracts. The crux of this claim is therefore whether or not defendants’ alleged behavior rose to the level of “intentional interference” with the dealer/supplier contracts.
 

 Plaintiffs’ contracts with Universal appear to be contracts that are “terminable at will.”
 
 See
 
 Amend. Comp. ¶ 135, stating: “ Paragraph TO’ of the Universal/ETD contract provides that the contract may be terminated ‘upon ten (10) days written notice.’ ” As a result, plaintiffs must show that defendants used “wrongful means” in bringing about Universal’s breach. Plaintiffs have pled three different wrongful means in this regard: 1) Ingram and VPD’s threats to Universal that all distributors would go out of business if they were not given exclusive distributorships, 2) offers of “unprecedented special treatment to Universal [pjroduct,” Amend. Comp. ¶ 129, and 3) violations of the Sherman Act.
 

 The former two means cited by plaintiff do not appear to rise to the level of “wrongful means.” Indeed, offers of special treatment and forecasts of the distributor market’s demise seem more on the level of “persuasion” than anything else. Universal could freely choose to accept or reject them as it wished. The latter means, however, does appear to be wrongful. To induce Universal’s breach in order to further an anti-competitive conspiracy rises to the level of unlawful behavior that the tortious interference claim is designed to prevent. Since we have not dismissed all the of the antitrust claims above, the tortious interference claim can rest on this single allegation of improper means.
 

 b. Plaintiffs’ contracts with Retailer-Customers
 

 Plaintiffs have also alleged that all three defendants tortiously interfered with their contracts with retailer-customers by coercing numerous customers to terminate their contracts with plaintiffs. Defendants respond that plaintiffs have not adequately specified which contracts were interfered with nor have they alleged critical elements such as whether the contracts were for a specified period of time or terminable at will. Moreover, notwithstanding the foregoing, defendants assert that plaintiffs have not alleged any tortious interference beyond the bare conclusory statement that defendants used “treats, bribery, defamation and/or coercion” to achieve their goals.
 

 While plaintiffs have alleged a number of facts suggesting wrongful means under
 
 *CDXLVIII
 
 this claim, the Court finds that plaintiffs’ failure to specify which contracts with retailer-customers were interfered with and whether or not those contracts were terminable at will warrants dismissal of this claim. While plaintiffs attempt in their brief to salvage the claim by specifying that it is “the retailers on plaintiffs’ customer lists” who have been interfered with, even this level of specificity is inadequate. As
 
 World Wide Communications
 
 has held, “[without pleading anything beyond the existence of ‘contracts,’ we cannot find that the interference alleged is wrongful or improper, and therefore tortious.” 1997 WL 795750, at *7 (internal citations omitted). The Court is provided with no information about the identity of any of these retailer-customers and is given no sense of how many of them terminated their contracts. Furthermore, plaintiffs’ failure to specify whether the alleged agreements with retailers were guaranteed or terminable at will leaves the Court unable to determine which standard to apply when assessing defendants’ behavior for tortious interference. Accordingly, the Court dismisses this allegation of tortious interference for lack of particularity.
 

 S. Breach of Contract
 

 Plaintiff ETD has also alleged a breach of contract claim against defendant Universal. According to ETD, paragraph 10 of its contract with Universal provides that their contract can be terminated only “upon ten (10) days written notice.” Universal has never provided it with any written notice of termination, ETD alleges. All the same, Universal has refused to provide ETD with Universal product as their agreement requires, and has thereby breached their contract. As a result, ETD claims, it has suffered damage from having been unable to notify its retailer-customers in advance that it would be unable to fulfill their orders, attendant harm to its business reputation and the loss of a substantial number of current and future clients. Am. Compl. ¶¶ 124-25.
 

 Under New York, California and Texas law, the essential elements of a breach of contract claim in federal court are: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.
 
 Harsco Corp. v. Segui,
 
 91 F.3d 337, 348 (2d Cir.1996);
 
 M.G. Chamberlain & Co. v. Simpson,
 
 343 P.2d 438, 445, 173 Cal.App.2d 263, 274 (1959); 2 Witkin, California Procedure, 1226, § 251 et seq.;
 
 Prudential Sec., Inc. v. Haugland,
 
 973 S.W.2d 394, 397 (Tex.App.—El Paso 1998, pet. denied);
 
 Wright v. Christian & Smith,
 
 950 S.W.2d 411, 412 (Tex.App.—Houston [1st Dist.] 1997, no pet.);
 
 McCulley Fine Arts Gallery, Inc. v. “X” Partners,
 
 860 S.W.2d 473, 477 (Tex.App.—El Paso 1993, no writ). Such elements need not be pleaded extensively or individually; they need only constitute “a short and plain statement showing that the pleader is entitled to relief.”
 
 Campo,
 
 857 F.Supp. at 270.
 

 The Court finds that plaintiff has satisfied the pleading requirements with respect to this claim. It has adequately alleged the existence of a written contract, defendant’s breach and damages. Defendant, to be sure, has raised three arguments in support of its motion to dismiss this claim: 1) that plaintiff cannot demonstrate that defendant’s breach was the proximate cause of its injury, 2) that plaintiffs claim was a mandatory counterclaim to Universal’s collection action against ETD in the Central District of California, and 3) that the only damages available to plaintiff are those which accrued during the 10-day notice period allegedly required by the contract. However, all three of these arguments concern the merits of plaintiffs claim and are therefore not
 
 *CDXLIX
 
 properly addressed on a motion to dismiss. Accordingly, plaintiffs claim for breach of contract against Universal survives the motion to dismiss.
 

 CONCLUSION
 

 For the aforementioned reasons, the Court dismisses plaintiffs’ claims under Section 2 of the Sherman Act, as well as plaintiffs’ claims of
 
 per se
 
 illegal group boycott and price-fixing violations under Section 1 of the Sherman Act. However, plaintiffs have adequately alleged a rule of reason violation of Section 1 of the Sherman Act, as well as claims under §§ 2(a), 2(d), 2(e) and 2(f) of the Robinson-Patman Act. The Court also dismisses the tortious interference claims against Universal on all counts and against Ingram and VPD with respect to plaintiffs’ contracts with retailer-customers, but not the claim against Ingram and VPD with respect to plaintiffs’ contracts with Universal. Finally, the Court finds that plaintiffs have adequately pleaded a fraud and misrepresentation claim and a breach of contract claim.
 

 SO ORDERED.
 

 [1]
 

 . The “sell-through” market refers to videos and DVDs that are sold to customers of the retail outlets, as opposed to rented.
 

 [2]
 

 . Valley is not a defendant in this case. Plaintiffs allege upon information and belief that Ingram is in the process of purchasing Valley. Am. Compl. ¶ 31.
 

 [3]
 

 . Presumably plaintiffs are referring to Valley’s presence in the video and DVD rental market, as they have alleged that Valley has the exclusive right to market Universal films in the "sell-through” market. Am. Compl. ¶ 71.
 

 [4]
 

 . The Court does not read
 
 PepsiCo
 
 to require that a group boycott be exclusively horizontal in nature for the
 
 per se
 
 rule to apply. This interpretation would call into doubt several seminal group boycott cases, cited by plaintiffs, which applied the
 
 per se
 
 rule to boycotts involving parties on different levels of the distribution chain.
 
 See, e.g., United States v. General Motors,
 
 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966);
 
 Klor's, Inc. v. Broadway-Hale Stores, Inc.,
 
 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). Rather, the Court reads
 
 PepsiCo
 
 to stand for the proposition that the boycott must
 
 originate
 
 among the horizontal competitors. To the extent that the defendants are arguing the former interpretation, the Court rejects that position.
 

 [5]
 

 . “Cross-elasticity of demand” refers to "the extent to which consumers will change their consumption of one product in response to a price change in another.”
 
 Pepsico, Inc.
 
 v.
 
 Coca-Cola Co., Inc.,
 
 No. 98 Civ. 3282, 1998 WL 547088, at *5 (S.D.N.Y. Aug.27, 1998)
 
 *CDXXXIII
 
 (quoting
 
 Eastman Kodak v. Image Technical Servs.,
 
 504 U.S. 451, 469, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)).
 

 [6]
 

 . Plaintiffs' reliance on
 
 United States v. Loew’s Inc.,
 
 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) is misplaced. Although the
 
 Loew’s
 
 Court affirmed that a copyrighted film is entitled to a presumption of uniqueness, that case focused on whether a court could infer the presence of market power from ownership of a particular copyright in analyzing the legality of "block-booking” practices — a form of tying arrangement.
 
 See id.
 
 at 48-50, 83 S.Ct. 97. The case contains no general discussion of whether each film constitutes its own market. Hence, the Court sees no direct support in
 
 Loew’s
 
 for plaintiffs' position.
 

 [7]
 

 . Moreover, it is worth noting that, although Universal markets its movies directly to major retail chains such as Blockbuster and Hollywood Video,
 
 see
 
 Pis.' Mem. of Law in Opp. at 21, there is no indication that Universal would sell its films directly to smaller retail outlets if it were approached. Indeed, it seems likely that the reason Universal employs a dual distribution system is so that marketing to smaller retailers, and the considerable time and effort that it takes, may be handled by intermediate distributors who have built up business relationships and networks with these smaller shops.
 

 [8]
 

 . Defendants cite
 
 PepsiCo
 
 in support of their position, asserting that the court held that distribution of fountain-dispensed soft drinks by independent foodservice distributors was not a relevant market. However, defendants cite the court’s decision concerning Coca-Cola's
 
 summary judgment
 
 motion.
 
 See Pepsi-Co,
 
 114 F.Supp.2d at 247-58. At that point, the court had before it sufficient evidence, elicited through discovery, to be able to evaluate the alleged relevant market and determine whether it was, indeed, viable. By contrast, at the motion to dismiss stage, the court felt unable to hold that the market was inadequately alleged.
 
 See Pepsico,
 
 1998 WL 547088, at *12.
 

 [9]
 

 . Plaintiffs' argument that Universal can be considered a monopolist because it controls 100% of Universal products is meritless. As the Fifth Circuit has stated, "[o]bviously, every manufacturer has a natural monopoly over the distribution of its products. That monopoly, however, does not contravene the antitrust laws.”
 
 Riddell,
 
 673 F.2d at 791 (diing
 
 United States
 
 v.
 
 E.I. du Pont de Nemours & Co.,
 
 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). Moreover, as previously explained, the relevant market in this case is not Universal products; it is "the wholesale distribution market for 'sell-through' and rental movie videos and DVDs in the United States.” Am. Compl. ¶ 22.
 

 [10]
 

 . Primary line price discrimination occurs where the seller's price discrimination harms other sellers. Secondary-line price discrimination occurs where the seller's price discrimination harms competition among the seller's customers — in this case, the wholesale distributors.
 
 See George Haug Co. v. Rolls Royce Motor Cars, Inc.,
 
 148 F.3d 136, 141 n. 2 (2d Cir.1998)
 

 [11]
 

 .
 
 But see FTC v. Morton Salt Co.,
 
 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (holding that quantity discounts that appear on the face of things to be "available'' to all buyers may not functionally be available to many smaller buyers). Flash and FTD are arguably "smaller buyers” in comparison to Ingram and VPD, who according to plaintiffs' complaint, control approximately 50% and 25% of the market for wholesale distribution of video rentals. Amend. Comp. ¶¶ 27-28.
 

 [12]
 

 . Defendants also raise a series of other objections to plaintiffs’ 2(f) claim. First, they allege that plaintiffs do not mention them specifically by name in their allegations, instead referring to "wholesale distributors” and "plaintiffs’ competitors.” While it is true that plaintiffs do not refer to defendants by name in each of their allegations, plaintiffs do refer to them frequently enough throughout the section that a reader, especially a reader who was drawing inferences in favor of the plaintiff, could easily understand the defendants to be the subjects of the claims. Moreover, in plaintiffs’ 2(f) allegation in ¶ 146, Ingram and VPD are mentioned specifically by name.
 

 Next, defendants allege that plaintiffs cannot raise a § 2(f) claim on the basis of a violation of § 2(d) or § 2(e). While courts are split on whether a § 2(f) claim can be derived from §§ 2(d)-(e) violations
 
 (see Murdoch,
 
 2001 WL 1607039 (S.D.N.Y.2001);
 
 but see Intimate Bookshop v. Barnes & Nobles,
 
 88 F.Supp.2d 133 (S.D.N.Y.2000)), such a charge is mooted by the fact that plaintiffs’ have also successfully raised a § 2(a) claim, from which a § 2(f) claim can indisputably be derived.
 

 Lastly, defendants assert that plaintiffs have not alleged that the purported price differentials granted to Ingram and VPD were not justified by Universal’s need to meet the price of its competitors. While "meeting the competition’s price” is admittedly an affirmative defense for sellers under §§ 2(a), (d) and (e), it is irrelevant to a buyer’s defense under § 2(f) and particularly irrelevant at the motion to dismiss stage.
 

 [13]
 

 . The requirement stated in defendant Universal’s brief that a plaintiff must prove that defendant acted with “exclusively malicious motivation” in procuring the breach of contract was implicitly overruled by the 1996
 
 Guard-Life
 
 decision. While defendants cite a 1997 case in support of this proposition,
 
 Elliot Assocs. v. Republic of Panama,
 
 975 F.Supp. 332, 341 (S.D.N.Y.1997), a closer examination of that case reveals that it only cites pre-1996 cases to support this notion,
 
 (e.g. Wegman v. Dairylea Coop., Inc.,
 
 50 A.D.2d 108, 376 N.Y.S.2d 728, 736 (4th Dep't 1975);
 
 Sadowy v. Sony Corp. of America,
 
 496 F.Supp. 1071, 1080 (S.D.N.Y.1980);
 
 Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.,
 
 179 A.D.2d 592, 579 N.Y.S.2d 353, 354 (1st Dep’t 1992);
 
 Benjamin Goldstein Productions, Ltd. v. Fish,
 
 198 A.D.2d 137, 603 N.Y.S.2d 849, 851 (1st Dep’t 1993). As a result,
 
 Elliott)
 
 states the wrong proposition of law. The correct standard is stated above.